147 P.3d 785

Sione TAUESE, Plaintiff–Appellant,

v.

STATE of HAWAI'I, DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS; Ritz–Carlton Kapalua; Marriott Claims Services Corporation, Defendants–Appellees.

Sione A. Tauese, Claimant–Appellant,

v.

Ritz–Carlton Kapalua and Marriott Claims Services Corporation, Employer/Insurance Carrier–Appellee

and

Special Compensation Fund, Appellee.

Nos. 26389, 26899.

Supreme Court of Hawai'i.

Nov. 20, 2006.

As Corrected Nov. 21, 2006.

Herbert R. Takahashi, Stanford H. Masui, Danny J. Vasconcellos, and Rebecca L. Covert (Takahashi, Masui, Vasconcellos & Covert), Honolulu, on the briefs, for Claimant-Appellant Sione Tauese.

Robert A. Chong and J. Thomas Weber (Ayabe, Chong, Nishimoto, Sia & Nakamura), Honolulu, on the briefs, for Defendants-Appellees Ritz–Carlton Kapalua and Marriott Claims Services Corp.

Robyn M. Kuwabe and Frances E. Lum (Deputy Attorneys General), on the briefs, for Defendants-Appellees Department of Labor and Industrial Relations and Special Compensation Fund.

NAKAYAMA, ACOBA, and DUFFY, JJ.; with MOON, C.J. and LEVINSON, J., Concurring Separately.

Opinion of the Court by ACOBA, J.

In this consolidated appeal Plaintiff/Claimant-Appellant Sione A. Tauese (Appellant) appeals from (1) the January 27, 2004 Judgment of the circuit court of the second circuit (the court), granting the motion to dismiss or in the alternative for summary judgment filed by Defendants/Employer/Insurance Carrier-Appellees Ritz–Carlton Kapalua (Ritz–Carlton) and Marriott Claims Services Corporation (Marriott) on Appellant's August 28, 2002 complaint for declaratory and injunctive relief against Ritz–Carlton, Marriott and Defendant–Appellee State of Hawai'i, Department of Labor and Industrial Relations (DLIR or Department) to halt proceedings against Appellant for a fraudulent insurance act under Hawai'i Revised Statutes (HRS) § 386–98(a)(8) (Supp.2005)[1] in Civil

---

1. Hawai'i Revised Statutes (HRS) § 386–98 (Supp.2005), entitled "Fraud violations and penalties," provides in relevant part as follows:

(a) *A fraudulent insurance act, under this chapter, shall include acts or omissions committed by any person who intentionally or knowingly acts or omits to act so as to obtain benefits,* deny benefits, obtain benefits compensation for services provided, or provides legal assistance or counsel to obtain benefits or recovery *through fraud or deceit by* doing the following:

. . . .

(8) *Misrepresenting or concealing a material fact*[.]

. . . .

No. 02-1-0414, and (2) the October 7, 2004 Decision and Order of the Labor and Industrial Relations Appeals Board (LIRAB) affirming the decision of the Director of the DLIR finding, *inter alia*, that Appellant committed a fraudulent insurance act under the aforesaid section in Case No. AB 2002-462(M) (8-00-03858), and ordering a total suspension of Appellant's workers' compensation benefits, that Appellant reimburse Ritz-Carlton for attorney's fees and costs incurred because of the fraud complaint, and that Appellant pay $5000.00 to the Special Compensation Fund.[2] We hold that fraudulent insurance acts under HRS § 386-98(a)(8) must be proven by clear and convincing evidence. Inasmuch as the LIRAB found on the complaint of Ritz-Carlton and Marriott that Appellant violated HRS § 386-98(a)(8) by a preponderance of the evidence rather than by clear and convincing evidence, we vacate its October 7, 2004 decision and order and remand to the LIRAB for a rehearing in accordance with this opinion. Because we remand, we hold, further, that (1) Appellant has failed to show that HRS § 386-98 (Supp.2005) improperly delegates the police power of commencing a proceeding to a private entity when administrative penalties are involved; (2) a fraudulent insurance act under HRS § 386-98 requires proof that the logical result or purpose of a person's acts or omissions is to fraudulently obtain benefits, and does not require that benefits actually be received; (3) administrative penalties imposed pursuant to HRS § 386-98(e) are not criminal in nature; (4) misrepresentations before the DLIR are not constitutionally protected by the First Amendment; and (5) statements made to a physician during an independent medical examination (IME) are not subject to the physician-patient privilege. We conclude that Appellant has failed to establish reversible error as to other points he raises on appeal from the LIRAB decision.

We discern no reversible error committed by the court in Appellant's appeal from the court's January 27, 2004 judgment and affirm that judgment.

## I.

On November 2, 2000, Appellant suffered an on-the-job accident while employed as a housekeeper by Ritz-Carlton. Appellant fell while using a desk and chair as a ladder to clean the ceiling. On November 4, 2000, Appellant saw Helen Percy, M.D. (Dr. Percy) for treatment of his injuries. Dr. Percy diagnosed Appellant as having suffered a lumbosacral strain, a contusion on his right but-

---

(d) An offense under subsections (a) and (b) shall constitute a:
 (1) Class C felony if the value of the moneys obtained or denied is not less than $2,000;
 (2) Misdemeanor if the value of the moneys obtained or denied is less than $2,000; or
 (3) Petty misdemeanor if the providing of false information did not cause any monetary loss.
Any person subject to a criminal penalty under this section shall be ordered by a court to make restitution to an insurer or any other person for any financial loss sustained by the insurer or other person caused by the fraudulent act.
(e) *In lieu of the criminal penalties set forth in subsection (d), any person who violates subsections (a) and (b) may be subject to the administrative penalties* of restitution of benefits or payments fraudulently received under this chapter, whether received from an employer, insurer, or the special compensation fund, to be made to the source from which the compensation was received, and one or more of the following:
 (1) *A fine of not more than $10,000 for each violation;*

(2) Suspension or termination of benefits in whole or in part;
 . . . .
(6) Reimbursement of attorney's fees and costs of the party or parties defrauded.
(f) *With respect to the administrative penalties set forth in subsection (e),* no penalty shall be imposed except upon consideration of a written complaint that specifically alleges a violation of this section occurring within two years of the date of said complaint. A copy of the complaint specifying the alleged violation shall be served promptly upon the person charged. The director or board shall issue, where a penalty is ordered, a written decision stating all findings following a hearing held not fewer than twenty days after written notice to the person charged. Any person aggrieved by the decision may appeal the decision under sections 386-87 and 386-88.
(Emphases added.)

2. Ritz-Carlton, Marriott, and the Special Compensation Fund are collectively referred to herein as Appellees.

tock, and a contusion on his left knee. She certified that Appellant's accident resulted in disability for work, with the disability beginning on November 4, 2000.

On November 5, 2000, Appellant filed a workers' compensation claim for the injuries sustained in the accident. On November 13, 2000, he began physical therapy through Rehab Outpatient Services at the Rehabilitation Hospital of the Pacific (Rehab Outpatient Services). On December 4, 2000, Appellant had a follow-up visit with Dr. Percy. She concluded that Appellant was still unable to work, even on half-time light duty, and referred him to Darren Egami, M.D. (Dr. Egami), an orthopedic surgeon. Dr. Egami began treating Appellant on December 7, 2000.

Dr. Egami referred Appellant to George E. Powell, M.D. (Dr. Powell), a neurologist, for a magnetic resonance imaging (MRI)[3] study of the lumbosacral spine. The MRI study was performed on February 6, 2001. In his report dated February 12, 2001, Dr. Powell diagnosed Appellant as suffering from "[l]umbar strain" and "[p]ossible bruise of the sciatic nerve area with persistent sciatica." In the "Recommendations" section of his report, Dr. Powell stated that "[f]urther physical therapy might be of benefit. One might also consider referral to a chronic pain clinic."

On February 15, 2001, Dr. Egami certified Appellant as unable to work until March 2, 2001, when he released Appellant to light duty work. On March 7, 2001, Dr. Egami certified Appellant as unable to work for three days due to pain in Appellant's lower back. Thereafter, Appellant was to return to light duty work.

Appellant met with Dr. Egami on March 29, 2001, at approximately 9:00 a.m. Dr. Egami noted that Appellant reported lower back pain with a severity of five-out-of-ten, on a scale of one to ten. Dr. Egami released Appellant for work beginning the next day, March 30, 2001. The release certification dated March 29, 2001 did not restrict Appel-

lant's hours, but indicated no lifting greater than twenty pounds and no bending.

On that same day, March 29, 2001, Appellant was under surveillance by McCormack Investigations, Inc. for Ritz–Carlton. At approximately 11:26 a.m., Investigator Ivan Alatan (Alatan) videotaped Appellant, along with several other men, skinning and cutting the carcass of a cow near a ranch along Hana Highway. Alatan's "Synopsis Surveillance Report" summarizes observations of Appellant bending over while skinning the cow, cutting meat from the carcass, placing the meat into plastic bags, and moving the bags around the back of a pickup truck for approximately one hour:

> 11:26 a.m.—Videotaped [Appellant] over approximately the next 17 minutes as he stood on the right side of the cow's carcass, bent at the waist appearing to skin the cow with the unidentified males, walked around to the rear of the carcass, spread his feet and legs wider than shoulder width, bent at the waist, walked to his right, appearing to squat continuing to clean the carcass.
>
> . . . .
>
> 11:46 a.m.—Videotaped [Appellant] over the next 14 minutes as he stood, bent at the waist at the front of the carcass appearing to cut away the hide with his feet and legs spread wider than his shoulders, stood upright, bent at the waist appearing to cut away the left front leg of the carcass, stood while carrying the leg, placed the leg in a large trash bag that an unidentified female held.
>
> . . . .
>
> 12:04 p.m.—Videotape[d Appellant] over approximately the next 30 minutes as he stood with his feet and legs spread apart at shoulder width, bent at the waist, stretched to his right spreading his legs farther apart while bending at the right knee appearing to cut the ribs of the carcass, placed his right elbow on his right knee appearing to brace himself while reaching with his left arm . . . bent at the waist with his feet and legs spread . . .

3. Magnetic Resonance Imaging (MRI) is a noninvasive diagnostic technique that produces computerized images of internal body tissues and is based on nuclear magnetic resonance of atoms within the body induced by the application of radio waves. Webster's Third New Int'l Dictionary, http://unabridged.merriam-webster.com (last visited Oct. 31, 2006).

stood upright while carrying a piece of rib into large trash bag that an unidentified female held open, stood upright, bent at the waist continuing to cut pieces of the carcass, bent at both knees and squatted, stood upright, walked to the rear of a pickup appearing to wash a piece of the carcass, walked to the rear of the Nissan, stood next to the pick-up, lifted his left leg onto the tailgate bending at the left knee, lifted himself into the bed of the pick-up, bent at the waist appearing to tie and lift the large trash bags containing the meat, arranged the bags in the bed of the pick-up, stood upright, bent at both knees to climb down off the bed of the pick-up, sit [sic] on the tailgate for a brief time.

On April 2, 2001, Appellant was discharged from physical therapy. On April 10, 2001, Appellant underwent a functional capacities evaluation (FCE) at Rehab Outpatient Services with occupational therapist John Mizoguchi (Mizoguchi). Appellant reported constant low back pain and being able to sit comfortably for only one hour at a time, being able to stand for only fifteen to thirty minutes at a time, and being able to walk for only thirty minutes at a time. The FCE concluded that Appellant "was able to safely demonstrate material handling up to the light to light-medium physical demand characteristic of work category," for an eight-hour work day. However, the FCE concluded that Appellant was not able to perform the housekeeping job as described.

By letter dated April 26, 2001, Appellant was informed by Marriott that it had scheduled an independent medical examination/rating examination (IME) for him with David Toeller, M.D. (Dr. Toeller) on May 9, 2001. Dr. Toeller conducted the IME and submitted his "IME/[Permanent Partial Disability (PPD)] Evaluation Report" (IME Report) to Marriott on May 9, 2001.

According to the IME Report, during the IME, Appellant reported that his back was no different than it was a few months earlier. He complained of pain in the lower back radiating into his right leg and pain in his right hip. Appellant maintained he was unable to sit or stand for very long, and could not walk for more than fifteen minutes without having to stop due to pain. Appellant reported that he was much worse if he had to bend over to pick things up. He stated that he can no longer play tennis or rugby or go hunting due to back pain. Dr. Toeller recorded Appellant grimacing and complaining of pain throughout the examination. He further noted that when Appellant left the office, "he was walking with an antalgic gait, demonstrating a pain behavior regardless on which leg he would bear the weight."

Dr. Toeller tested Appellant's range of motion in his lower back, but determined that "patient's ranges of motion could not be determined with an inclinometer as they were outside of the valid range on repeat testing, exceeding 20% differences from the beginning to the end of the exam." Appellant showed Dr. Toeller a bruise on his right hip which he stated was from the November 2, 2000 injury. Dr. Toeller stated in the IME Report that this was "medically impossible."

Dr. Toeller also examined Appellant's hip motions. He reported that "[o]n the right side, [Appellant's] hip motions were not measured due to his pain complaints." Dr. Toeller observed, however, that Appellant had "excellent hip flexion in the seated position when I was not testing him but could not tolerate the hip flexion in the supine position when I was formally testing him. This is inconsistent." Regarding testing of Appellant's ability to raise his legs, Dr. Toeller reported:

> Straight leg raising tests could be tolerated to no more than 15 [degrees] on either side. Noticeable grimacing and complaints of pain accompanied this perfectly symmetrical loss. Immediately thereafter, the patient was able to sit up in a jackknife position exceeding 90 [degrees] of straight leg raising and have a conversation with me without pain. This is also most inconsistent.

Dr. Toeller observed that Appellant "was tender to superficial palpation throughout the entire L5 circle and both sacroiliac joints" and that "[t]his was inconsistent with the fact that I could press hard on his back when I was helping him get off the table without complaints."

Dr. Toeller concluded that Appellant's examination "was clearly and purposely factitious" and that "[t]he only objective abnormalities on today's examination were findings of a purposely factitious examination." Regarding the FCE, he stated that it was "in error" and that Appellant "should be returned to full duty immediately." In his final conclusions, Dr. Toeller found:

1. This gentleman sustained a sprain/strain to his low back, contusions to the right hip and left knee at work 6 months ago.

2. By all objective criteria, he is fully recovered with no impairment. He has reached maximum medical improvement and is capable of full duty.

3. The patient would disagree with my determination[.] Nevertheless, I am essentially ignoring his profound subjective complaints of pain and impairment since they are unreasonable, inconsistent with normal pain behavior, incompatible with his known objective tests, and accompanied by a factitious exam.

Dr. Toeller thus rated Appellant's permanent whole person impairment at 0%.

On May 10, 2001, one day after Appellant's IME, Dr. Toeller reviewed the surveillance video of Appellant recorded on March 29, 2001. Upon reviewing the video, Dr. Toeller submitted to Ritz–Carlton an "Addendum to IME/PPD Evaluation," which included images from the video. Dr. Toeller assessed Appellant's actions on the video and reaffirmed his previous conclusions:

In this video, [Appellant] is participating in cleaning a large animal. He spends extended periods of time forward flexed at the lumbosacral spine with his hands outstretched in front of him working. During this video [Appellant] is up and down several times from that bent over position. His flexibility is superior with forward flexion exceeding 100 [degrees] during this period. He has the ability to get up and down several times without any sign of pain behavior, grimacing nor are there any

actions that would be protective of a sore back.

My IME yesterday concluded that [Appellant] had given me a purposely-factitious presentation. This video simply confirms that opinion. There are unacceptable differences between [Appellant's] rather extreme fluid motions in the video vs. the presentation that he made to Dr. Egami on the same day; the performance at the [FCE] a week-and-a-half later; and the impaired performance he demonstrated in my office yesterday.

The doctor also noted that "[t]his tape further cements my feeling that the [FCE] was in error." Dr. Toeller considered several possible explanations for these differences, but concluded that "the diagnosis of the factitious presentation is the only reasonable conclusion I can make."

## II.

On May 23, 2001, Ritz–Carlton and Marriott requested a hearing before the Department to address Appellant's permanent disability. On August 7, 2001, the Department issued a "Notice of Hearing" stating that a hearing would be held before the Department on September 6, 2001. At the September 6, 2001 hearing, Appellant appeared with a Tongan interpreter[4] and without counsel.

Relying on Dr. Toeller's May 9, 2001 report, counsel for Ritz–Carlton and Marriott argued that Appellant was "less than candid" with Dr. Toeller during his May 9, 2001 examination. Counsel for Ritz–Carlton and Marriott stated that, based on Dr. Toeller's 0% whole person impairment rating, it was their position that Appellant was not entitled to any permanent disability as a result of the November 2, 2000 accident.

Appellant described the November 2, 2000 accident and the treatment he had received from Dr. Percy, Dr. Powell, and Dr. Egami. He testified that he still had pain in his back and that he needed to lie down for one hour after work due to the pain. During cross-examination by counsel for Ritz–Carlton and

---

4. Appellant states in his opening brief in S.C. No. 26899 that he immigrated from Tonga to find work. He did not graduate from high school in Tonga or in the United States. Appellant's primary language is Tongan, which he speaks at home. English is his second language.

Marriott, Appellant maintained that his back was "very sore" when he returned to work on March 30, 2001. He further stated that he could no longer play tennis or go hunting.

Appellant testified that he had difficulty squatting and bending:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Can you bend your knees? Can you squat down?

[APPELLANT]: I can squat, but the pain will get worse on that one.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: How long can you squat?

[APPELLANT]: I think for squat, I no can go long and stay on myself.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: What's the longest you can squat?

[APPELLANT]: I don't know. Maybe five seconds or something.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: How about bending over? If you are standing up and you have to bend over, can you bend over?

[APPELLANT]: I can bend over; but like what I say, it's not 10 seconds, 15 seconds.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Not longer?

[APPELLANT]: Not longer.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: What happens if you squat too long or you bend over too long, what happens?

[APPELLANT]: *You know, that point I no can do that because I don't want to force myself to get pain. I no can do something I know I already have pain.*

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: *Would this have been true back in March, when you went back to work, of this year?*

[APPELLANT]: *Still the same the pain.* If I no do something, it's not really worse the pain. But if I try to force something, that's when the pain comes on.

(Emphases added.) Upon continued cross-examination, Appellant reiterated that in March 2001, he could not squat for very long

and could not bend over for very long because of the pain. He related that he disagreed with Dr. Toeller's report and that the bruise he had on his right hip was from the November 2, 2000 accident.

Appellant was questioned regarding Dr. Toeller's 0% whole person impairment rating:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Did Dr. Egami ever give you a rating—another rating after he saw you?

[APPELLANT]: No, he said he have to get back to you guys because he already gave me to somebody else already. He came to the insurance, you guys supposed to find a doctor for the rating. He said if he is the one to do it, he can tell me what rating on that time, but the insurance have to find their own doctor for that.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: This is our doctor, Dr. Toeller? Dr. Toeller said you have a zero percent rating?

[APPELLANT]: Yeah.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And you disagree with the [rating]?

[APPELLANT]: Yeah.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: How much do you think it's worth?

[APPELLANT]: I think like 10.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Ten percent?

[APPELLANT]: Yeah.

He testified that he did not do "any activities" and that "[a]ll I do is just go to church." When asked if he was still able to clean an animal after hunting, Appellant responded in the negative, but that he can try:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Can you do that anymore—clean the animal?

[APPELLANT]: No.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: *Did you ever try cleaning the animal after the accident?*

[APPELLANT]: *I can try, but I have a lot of friends, a lot of family they can do*

*that. Why I going do that if I have some-body to that?*

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: That's if you go hunt-ing:

[APPELLANT]: That's if I go, but I don't go hunting.

(Emphases added). Upon questioning from the hearing officer, Appellant recounted that he did stretching exercises three times a week as part of his rehabilitation and that pain in his back sometimes woke him from his sleep.

Prior to testifying at the hearing, Appel-lant had not seen the surveillance video tak-en on March 29, 2001, and was not given Dr. Toeller's Addendum to IME/PPD Evalua-tion, dated May 10, 2001. After Appellant testified, the video was shown at the hearing and Alatan narrated its contents. After the viewing of the video, counsel for Ritz–Carlton and Marriott asserted, *inter alia*, that the tape discredited Appellant's testimony and that Appellant was being "less than candid" with the DLIR.

Appellant then disputed that the tape dis-credited his testimony:

Like even that one you can see the date. I no really like do what I normally do. I can do but not too long. You can see the date. As soon as I bend a little bit, I feel the back is sore, lots of time I stand up. That one like he can think what rating for acci-dent. That one for me is not really a big deal that one. I no lifting anything heavy. I just try to help my friend for that one because we get some—like we take the cow, it's just for the family, and like what he say, he don't believe it. I think we can show him so he can see with his own eye too. And that's all I can say.

After Appellant's statement, the hearing offi-cer observed the bruise on Appellant's right hip. Upon viewing the bruise, he stated that "[w]hat I noticed was what appeared to be a bruise mark approximately two inches by one inch on the right hip. And it still actually retains the quality of a bruise, even though one doctor—was it May? And it's now Sep-tember?" The hearing officer informed the parties that a decision would be forthcoming and if they did not agree with it, they could appeal.

On September 28, 2001, the Department issued its Decision awarding Appellant bene-fits for temporary total disability (TTD), tem-porary partial disability (TPD), and disfig-urement. Specifically, regarding benefits, the Decision stated:

a. [TTD]: (Waiting period: 11/4/2000 through 11/6/2000) beginning 11/7/2000 through 11/22/2000; 11/24/2000 through 11/26/2000; 12/3/2000 through 3/1/2000; 3/7/2001 through 3/10/2001; 4/10/2001 only

NUMBER OF WEEKS: 16.1429 @ $402.49 = $6,497.36

b. [TPD]: beginning 11/23/2000 only; 11/27/2000 through 12/2/2000

NUMBER OF WEEKS: 1.0000 @ $262.49 = $262.49

. . . .

e. DISFIGUREMENT: 2″ by 1″ irregu-lar scar, right hip, flat and faintly hyper-pigmented

TOTAL: $400.00

Appellant was also awarded the cost of medi-cal care, services, and supplies as needed for the November 2, 2000 accident. He was not awarded permanent total disability or PPD benefits. There was no appeal from DLIR's September 28, 2001 Decision.

III.

On February 12, 2002, Ritz–Carlton and Marriott filed a complaint for fraud against Appellant with the Department. In Count I, the February 12, 2002 complaint alleged that Appellant had made several misrepresenta-tions resulting in him obtaining benefits he was not entitled to:

4. *[Appellant] intentionally or know-ingly misrepresented the nature and ex-tent of his injuries from at least March 29, 2001 forward, to obtain benefits by inform-ing his treating physician, Dr. Egami, that he had disabling pain. [Appellant] misrepresented his functional abilities to [Mizoguchi] at the Rehab at Maui during a [FCE] on April 10, 2001 and misrepre-sented his physical condition on May 9, 2001 to [Dr. Toeller].*

5. [Appellant] fraudulently obtained workers' compensation benefits under Chapter 386, [HRS], as amended, from at least March 29, 2001 forward, by concealing information and/or misrepresenting to his medical providers and [Ritz–Carlton/Marriott] the extent and/or nature of his injuries. *As such, the medical providers continued to treat [Appellant] and certify him to be unable to resume his usual and customary work so as to allow [Appellant] to obtain medical benefits and collect [TTD] and/or obtain a modified position at work.*

6. As a result of [Appellant's] misrepresentations, [Ritz–Carlton/Marriott] paid for medical treatment and examinations which were not required, and made overpayment of temporary disability benefits and/or provided modified work.

(Emphases added.) In Count II, Ritz–Carlton and Marriott further averred that Appellant had misstated his work abilities and therefore Ritz–Carlton had provided him with housing benefits to which he was not entitled:

8. *[Appellant] fraudulently misrepresented himself to be disabled from regular duty work and requested [Ritz–Carlton] provide him with housing.* As a result of these requests, [Ritz–Carlton/Marriott] paid monetary reimbursements to [Appellant] in an amount to be shown at hearing.

9. *[Appellant] fraudulently obtained workers' compensation benefits from [Ritz–Carlton] under Chapter 386, [HRS], as amended, by requesting and accepting housing benefits.* These violations occurred from at least March 29, 2001 and continued ongoing.

(Emphases added.) In Count III, Ritz–Carlton and Marriott averred that Appellant had violated HRS § 386–98:

11. [Appellant] has intentionally or knowingly acted so as to obtain benefits or recovery through fraud or deceit as defined under [HRS § 386–98], as amended, as follows:

a. *Presenting, or causing to be presented, a false or fraudulent claim for the payment of a loss;*

b. Making, or causing to be made, a false or fraudulent claim for payment of a health care benefit;

c. *Misrepresenting or concealing a material fact;*

d. Fabricating, altering, concealing, making a false entry in a document; and/or

e. Making, or causing to be made, false or fraudulent statements or claims with regard to obtaining legal recovery or benefits.

(Emphases added.) Ritz–Carlton and Marriott requested the following relief:

1. *Criminal penalties as afforded by law and/or;*

2. *[Appellant] be assessed the fine of not more than $10,000.00 for each violation and/or;*

3. Suspension or termination of workers' compensation benefits in whole or part and/or;

4. Suspension or disqualification from medical care, services or supplies, vocational rehabilitation services and other services rendered for payment under Chapter 386, [HRS], as amended and/or;

5. Recoupment by [Ritz–Carlton/Marriott] of all payments of medical and indemnity benefits, including housing, under Chapter 386, [HRS], as amended, in an amount to be shown at hearing.

6. *Payment of [Ritz–Carlton/Marriott's] attorney's fees and costs.*

7. Such other and further relief as the Director [of the Department] deems just and proper in the premises.

(Emphases added.)

On February 20, 2002, the Department informed Appellant that Ritz–Carlton and Marriott had filed a complaint for fraud against him and provided him with a copy of the complaint. The Department also informed Appellant that "[i]f it is determined that you violated [HRS § 386–98], you may be subject to criminal or administrative penalties; and benefits may be suspended or terminated."

On March 14, 2002, Appellant responded to the complaint denying that he had violated

HRS Chapter 386. He also asserted defenses to the complaint stating, *inter alia*, that the application of criminal penalties under HRS § 386–98 was unconstitutional, the Department did not have jurisdiction over criminal matters, and the complaint and HRS § 386–98 were unconstitutionally vague. Appellant asked that Ritz–Carlton and Marriott be denied all relief requested and that he be awarded attorney's fees and costs. On April 12, 2004, Appellant sent a letter to Ritz–Carlton and Marriott stating that the letter should be considered "a demand that [Ritz–Carlton and/or Marriott] withdraw its complaint."

On June 20, 2002, Appellant filed a motion with the Department for a bill of particulars and a demand for a preliminary hearing and jury trial on "criminal and other penalties charged against [him]." On June 25, 2002, the Department responded by returning Appellant's pleadings and informing Appellant that the complaint was filed under HRS § 386–98 and Hawai'i Administrative Rules (HAR) § 12–10–77, which are within the jurisdiction of the Department. The Department also informed Appellant that it "lacks jurisdiction in criminal proceedings."

### IV.

On August 28, 2002, Appellant filed a complaint in the court naming Ritz–Carlton, Marriott, and the DLIR as defendants. His complaint was docketed as Civ. No. 02–1–0414(1). He asserted that a hearing had been set by the Department for September 4, 2002 on the February 12, 2002 complaint filed by Ritz–Carlton and Marriott, and that allowing the hearing against Appellant as to administrative and criminal fraud would constitute double jeopardy and violate the U.S. and Hawai'i Constitutions. Appellant requested declaratory and injunctive relief prohibiting the Department, Ritz–Carlton, and Marriott from proceeding with the hearing and any other appropriate relief.

On September 3, 2002, a hearing was held before the Department. At the hearing, counsel for Ritz–Carlton and Marriott stated that they intended to voluntarily dismiss Count II, and that they would not contest any benefits paid to Appellant pursuant to the Department's September 28, 2001 Decision, including the TTD benefits paid for April 10, 2001. Counsel for Ritz–Carlton and Marriott stated that the complaint related to treatment and benefits received by Appellant after March 29, 2001. Counsel for Ritz–Carlton and Marriott also asserted that the fraud complaint was based on alleged misrepresentations made by Appellant at the September 6, 2001 Department hearing. Counsel for Appellant sought clarification that criminal penalties would not be addressed at the hearing:

> [COUNSEL FOR APPELLANT]: Before we proceed, one last clarification from [Appellant]. [Ritz–Carlton and Marriott's] complaint does allege criminal penalties.
>
> [HEARINGS OFFICER]: *We're not here to address any criminal penalties, [Counsel for Appellant], I can't do that.*
>
> [COUNSEL FOR APPELLANT]: Yes, I want to make clear for the record—
>
> [HEARINGS OFFICER]: *The only penalties that we assess are pursuant to [HRS] 386–98.*
>
> [COUNSEL FOR APPELLANT]: Thank you.

(Emphases added.)

Mizoguchi testified at the hearing and stated that he still believed his findings from the FCE were accurate. He related that viewing the video taken on March 29, 2001 did not impact his findings inasmuch as he believed Appellant's activities on the video suggested that he was experiencing pain. Mizoguchi observed Appellant's facial grimacing and possible stretching of the back. He stated that although he did not disagree with Dr. Toeller's findings, they were different than his. Lastly, Mizoguchi reported that Appellant "[d]emonstrated motivation" to return to work, that the results of physical tests run on Appellant were consistent with his injuries, and that Appellant "put forth good and valid voluntary effort during the [FCE]."

At the hearing, Dr. Egami also testified. He stated that it would have been his routine to discuss with Appellant the restrictions contained in the March 29, 2001 release certi-

fication. Upon questioning regarding the March 29, 2001 video, Dr. Egami testified:

> Well, like I said, I mean, when I write something like this, you know, limitations for work, there is an unspoken understanding that that applies to work and also to general activities. You know, I don't write them for nothing. I expect patients on [sic] follow what it is I'm recommending. And I wouldn't have, you know, wanted [Appellant] to do that. I mean, I wouldn't have said it's okay to do that. You look like you were working really hard. And it didn't appear that you're having any trouble doing that. That's not what I would have wanted you to be doing. If I excused you from doing that at work, why would I say okay, you can do it on your free time as well. And that's the only thing I think about that video, it was not what I would have, you know wanted him to be doing.

(Emphases added.) When asked if Appellant had been "less than candid" during treatment after seeing the video, Dr. Egami responded, "I would say no, but that's a no with a little bit of a question mark." Dr. Egami also testified that Appellant's activities on the video would have aggravated Appellant's back pain. Dr. Egami indicated that he saw Appellant at some time in June of 2002 for a follow-up visit. He further stated that Appellant did not appear to show discomfort or back pain on the video. However, on cross-examination by counsel for Appellant, Dr. Egami testified that if Mizoguchi did not believe Appellant was "stepping out of the bounds [of the FCE] in that video, then that's probably accurate."

Part of the video was shown and Alatan again narrated it. Upon questioning by counsel for Appellant, Alatan maintained that his report was not meant to indicate that Appellant was bending over for the entire duration of the video. He viewed Appellant bending over and standing up throughout the video.

Appellant's immediate supervisor, Robert Kaninau (Kaninau), recounted that upon Appellant's return to work on March 30, 2001, his work responsibilities were modified to comply with Dr. Egami's restrictions of no bending and no lifting of over twenty pounds. Kaninau declared that if Appellant needed to lift anything weighing more than twenty pounds at work, he was given help, that he did not do any bending, and that he did not operate the carpet cleaner. He stated that the restrictions imposed by Dr. Egami ended at some time around April of 2001. Upon questioning by the Hearing Examiner, Kaninau explained that while Appellant was working under Dr. Egami's restrictions, he did not clean mold in bathrooms or move beds, as those tasks required bending.

After testimony had been taken, counsel for Ritz–Carlton and Marriott argued that Appellant had made misrepresentations to Dr. Toeller and provided a "factitious evaluation" in violation of HRS § 386–98. He stated that Ritz–Carlton and Marriott were seeking suspension of any benefits to Appellant from April 11, 2001 forward and an award of attorney's fees and costs.

Attorney for Appellant introduced Dr. Powell's February 12, 2001 report into evidence and asserted that it confirmed that Appellant was actually injured and that Dr. Toeller ignored Dr. Powell's report. He contended that Mizoguchi provided "the best evidence ... so far in this case" inasmuch as he was not hired by either party to conduct the FCE. Counsel for Appellant maintained that even assuming Appellant made misrepresentations to Dr. Toeller, Appellant did not receive any benefits after March 29, 2001.[5] The Hearing Examiner declared that a decision would be forthcoming and concluded the hearing.

### V.

In the court on September 23, 2002, Ritz–Carlton and Marriott filed their answer to Appellant's August 28, 2002 complaint.

---

5. This statement made by counsel for Appellant that Appellant did not receive any benefits after March 29, 2001 appears to be incorrect inasmuch as the Department's September 28, 2001 Decision awarded Appellant Temporary Total Disability (TTD) benefits for April 10, 2001. As discussed *supra*, counsel for Ritz–Carlton and Marriott stated that they did not contest those TTD benefits.

Therein, they raised numerous defenses, including, *inter alia*, failure to mitigate, failure to exhaust all administrative remedies, unclean hands, and an assertion that jurisdiction was with the Department and/or LIRAB. Ritz–Carlton and Marriott asked that Appellant's complaint be dismissed or that judgment be entered in their favor, and that they be awarded attorney's fees and costs, and any further appropriate relief.

On September 25, 2002, Appellant filed a demand for jury trial with the court.

On October 11, 2002, the Department issued its "Decision" stating that Appellant willfully misrepresented his physical abilities to Dr. Toeller and at the September 6, 2001 Department hearing for the purpose of obtaining benefits, in violation of HRS § 386–98(8):

It is clear that [Appellant] did not receive any compensation to which he was not entitled as a result of his actions. Nonetheless, based on the activities that [Appellant] was filmed performing on March 29, 2001, *it is determined that [Appellant] willfully misrepresented or concealed his actual physical abilities from Dr. Toeller, who examined him on May 9, 2001 for the purpose of evaluating his permanent impairment, as well as from the hearings officer at the hearing held on September 6, 2001,* which was convened for the purpose of determining the [Appellant's] entitlement to [PPD] benefits. *The [Appellant's] actions are determined to have been a willful misrepresentation or concealment of a material fact for the purpose of obtaining benefits in violation of [HRS § 386–98(8)], for which administrative penalties shall be assessed.*

(Emphases added.) The Department assessed the following administrative penalties:

1. Pursuant to [HRS § 386–98(e)(1) ], [Appellant] shall pay a fine of one lump sum of $5,000.00 into the Workers' Compensation Special Fund.

2. Pursuant to [HRS § 386–98(e)(2) ], the [Appellant's] *entitlement to benefits in this case is totally suspended, beginning April 11, 2001.*

3. Pursuant to [HRS § 386–98(e)(6) ], the [Appellant] shall *make reimbursement* to the employer/insurance carrier *for reasonable attorney's fees and costs* that the employer/insurance carrier incurred in pursuing this matter.

(Emphases added.) On October 16, 2002, Appellant appealed the October 11, 2002 "Decision" to LIRAB. On November 7, 2002, LIRAB issued a notice stating that an initial conference would be held in the instant case on December 5, 2002, a settlement conference would be held on April 12, 2004, and a hearing would be held on May 11, 2004.

On November 29, 2002, the Department filed its answer to Appellant's August 28, 2002 complaint in the court. Therein, the Department argued, *inter alia*, that Appellant's complaint was moot because the Department had already conducted a hearing for civil penalties on September 4, 2002. The Department raised the October 11, 2002 "Decision" as a defense inasmuch as it did not impose any criminal penalties and contended that Appellant was not entitled to a jury trial.

The initial conference, originally scheduled by the LIRAB for December 5, 2002, was rescheduled and was held on January 9, 2003. On January 10, 2003, LIRAB issued its "Pretrial Order," stating that the issues it would determine on appeal were:

1. Whether the [Department] erred in determining that [Appellant] committed fraudulent insurance acts under [HRS § 386–98(8) ].

2. If yes, whether the penalty assessed by the [Department] is appropriate.

On May 5, 2003, Ritz–Carlton and Marriott filed their "Motion to Dismiss or in the Alternative for Summary Judgment" in the court. They argued, *inter alia*, that the Department had exclusive original jurisdiction over all disputes arising under HRS chapter 386 and that Appellant had not exhausted his administrative remedies as the LIRAB hearing was still to be held on May 11, 2004.

On May 22, 2003, the Department filed a substantive joinder to the "Motion to Dismiss or in the Alternative for Summary Judgment" filed by Ritz–Carlton and Marriott. In addition to adopting the arguments made

by Ritz–Carlton and Marriott, the Department maintained that "[Appellant's] contention that the Department intends to permit an administrative hearing as to criminal penalties for fraud is patently untrue."

## VI.

In the court on May 23, 2003, Appellant filed his "Cross–Motion for Summary Judgment and Preliminary Injunction and for Writ of Mandamus." Therein, Appellant argued, *inter alia*, that HRS § 386–98 is unconstitutional because it improperly delegates the state's police power to private entities such as Ritz–Carlton and Marriott, the police power of the state cannot criminalize Appellant's statements made at the Department hearings because they are usually protected by the First Amendment to the U.S. Constitution, the criminal and administrative provisions found in HRS § 386–98 cannot be severed since the acts leading to penalties under each are inextricably woven together, and that even if HRS § 386–98(e) was deemed severable, penal penalties would be imposed without regard to the rules of evidence, a proper burden of proof, and notice as to the specifics of the crime.

With respect to the burden of proof issue, Appellant's primary argument was that HRS § 386–98 is unconstitutional on its face and as applied because the "statute provides no requirement as to a burden of proof for the imposition of administrative penalties," and, therefore, a "lesser standard than proof beyond a reasonable doubt required in criminal prosecutions" may be deemed to apply. Appellant stated that he was "charged, prosecuted, and fined" under the "substantial evidence" standard of proof, which was a lesser standard than the "clear and convincing evidence" standard used in civil cases of fraud. Appellant requested that the court issue a restraining order to prevent the DLIR, Ritz–Carlton, and Marriott from proceeding against him before the LIRAB.

On June 3, 2003, Ritz–Carlton and Marriott filed their opposition to Appellant's cross-motion in the court, asserting, *inter alia,* that HRS § 386–98(e) does not impose criminal penalties and that criminal penalties do not apply to administrative proceedings.

On June 4, 2003, Appellant filed his opposition to Ritz–Carlton and Marriott's May 5, 2003 motion, arguing that the instant case did not "arise under Chapter 386," so the court had jurisdiction, and that the Department lacked the power to determine the constitutionality of HRS § 386–98.

Also on June 4, 2003, the Department filed its opposition to Appellant's cross-motion in the court. The Department argued that "[Appellant] should proceed through the administrative process" before the LIRAB, and that HRS § 386–98 is not unconstitutional on its face or as applied inasmuch as it "specifically provides for criminal *or* administrative penalties for fraudulent acts under chapter 386, *not both.*" (Emphases in original.)

On June 6, 2003, Ritz–Carlton and Marriott filed their reply to Appellant's opposition to their May 5, 2003 motion. Therein, they contended that Ritz–Carlton and Marriott need not be parties to Appellant's constitutional challenge of HRS § 386–98 and that HRS § 386–98 is constitutional.

Also on June 6, 2003, Appellant filed his reply brief to the Department's objection to his cross-motion in the court. Therein, Appellant asserted that only the court could determine the constitutionality of HRS § 386–98 so he was not required to exhaust administrative remedies and HRS § 386–98 is punitive in purpose and effect.

 On July 14, 2003, the court issued its "Order granting [Ritz–Carlton and Marriott's] Motion to Dismiss, or[,] in the Alternative[,] for Summary Judgment Filed May 5, 2003, and [the Department's] Substantive Joinder Filed May 22, 2003 and Order Denying [Appellant's] Cross–Motion for Summary Judgment and Preliminary Injunction and for Writ of Mandamus Filed May 23, 2003." [6]

**6.** The court reasoned that in 1995, Hawaii's workers' compensation statutes were amended and that the amendments, for the first time, allowed offenses to be prosecuted criminally un-

der HRS § 386–98(d). According to the court, under HRS § 386–98(c), alternatively, the Department can treat workers' compensation fraud as a civil matter. The court said the Appellant

The court found that "the question of constitutionality of [HRS § 386-98] hinges upon [the court] being required to conclude that the proceeding which was commenced and which [was] still ongoing [was] clearly criminal in nature." The court found, however, that "[b]ased upon the record and the statutes, this was a finding that [it] could not make."

Nonetheless, the court found that "assuming for the moment in spite of HRS § 386-73 [ (1993) [7] ] ... [it] ha[d] the legal authority to pass on the constitutionality of HRS § 386-98, ... [Appellant] failed to meet his burden of overcoming the statutory presumption of constitutionality and has failed to demonstrate the degree of irreparable injury necessary for injunctive relief." The court did not issue a finding as to the appropriate standard of proof under HRS § 386-98. The court ultimately found "[t]here [was] no genuine issue of material fact, and the law limits the [c]ircuit [c]ourt's authority with regard to HRS [c]hapter 386," and that Appellant "failed to exhaust his administrative and Supreme Court remedies." [8]

had not shown that his ongoing administrative proceeding was "clearly criminal in nature." It was stated that HRS § 386-98 allows the Department to pursue civil penalties "in place of criminal proceedings and not concurrent with criminal proceedings, pursuant to HRS § 386-98(e)." Further, the court noted that "[Appellant] has not presented any case law that stands for the proposition that a statute which provides an administrative agency with two options, one civil and one criminal, is per se unconstitutional." The court explained that HRS § 386-98(e) does not authorize a term of imprisonment and that the common law has always recognized an action for civil fraud as well as criminal fraud. Further, it was recognized that the legislature had created a statutory penalty scheme in HRS § 386-98 that is less harsh than the criminal code as related to the monetary amount needed for an offense to qualify as a felony charge. The court concluded that the other possible penalties, e.g., restitution and suspension of benefits, were clearly civil remedies. The court explained that the legislature "took great pains to separate civil sanctions from criminal sanctions" and that there was no possibility that Appellant's case would become a criminal matter. Finally, the court concluded that Appellant had failed to exhaust his administrative remedies.

As to an order granting summary judgment, "[w]e review an award of summary judgment under the same standard applied by the circuit court." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks and citation omitted). While we decide the court's order was ultimately correct, we do so based on the grounds stated in this opinion. "[W]here the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling." *Reyes v. Kuboyama*, 76 Hawai'i 137, 140, 870 P.2d 1281, 1285 (1994) (citing *Brooks v. Minn*, 73 Haw. 566, 576-77, 836 P.2d 1081, 1087 (1992); *Shea v. City & County of Honolulu*,

67 Haw. 499, 507, 692 P.2d 1158, 1165 (1985); *Agsalud v. Lee*, 66 Haw. 425, 430, 664 P.2d 734, 738 (1983)). "This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it." *Id.* (citing *Waianae Model Neighborhood Area Ass'n v. City & County of Honolulu*, 55 Haw. 40, 43, 514 P.2d 861, 864 (1973); *McCarthy v. Yempuku*, 5 Haw.App. 45, 52, 678 P.2d 11, 16 (1984)).

7. HRS § 386-73 (1993) entitled "Original jurisdiction over controversies," states as follows:

Unless otherwise provided, the director of labor and industrial relations shall have original jurisdiction over all controversies and disputes arising under this chapter. The decisions of the director shall be enforceable by the circuit court as provided in section 386-91. There shall be a right of appeal from the decisions of the director to the appellate board and thence to the supreme court subject to chapter 602 as provided in sections 386-87 and 386-88, but in no case shall an appeal operate as a supersedeas or stay unless the appellate board or the supreme court so orders.

Effective July 1, 2006, there is "a right of appeal from the decisions of the director to the appellate board and thence to the *intermediate appellate court*[,]" and not to the supreme court. HRS § 386-73 (Supp.2005) (emphasis added).

8. Inasmuch as the LIRAB proceeding has been completed, the issue as to exhaustion of administrative remedies has become moot. It is well established that this court will not consider issues before it that have become moot:

The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so.

*Wong v. Bd. of Regents, Univ. of Hawaii*, 62 Haw. 391, 394-95, 616 P.2d 201, 204 (1980) (citations

On August 11, 2003, Appellant filed his notice of appeal from the court's July 14, 2003 order. This appeal was docketed as SC No. 25954. On December 12, 2003, this court dismissed SC No. 25954 on the ground that the court's July 14, 2003 order had not been reduced to a separate judgment, as required by Hawai'i Rules of Civil Procedure Rule 58.

In the LIRAB on January 9, 2004, Appellant filed a motion to stay proceedings. Appellant asserted that he intended to appeal the court's July 14, 2003 order once a final judgment was entered. He maintained that the LIRAB should stay all proceedings until the constitutionality of HRS § 386–98 was subject to this court's appellate review.

On January 28, 2004, the court entered its final judgment in favor of Ritz–Carlton, Marriott, and the Department, and against Appellant. On February 6, 2004, Appellant filed his notice of appeal from the court's January 28, 2004 final judgment. This appeal was docketed as SC No. 26389.

### VII.

### A.

In the LIRAB on February 6, 2004, Ritz–Carlton and Marriott filed their opposition to Appellant's motion to stay the LIRAB proceedings. Therein, they argued, *inter alia,* that Appellant was unlikely to prevail on his appeal and that he should exhaust his administrative remedies.

On February 11, 2004, the Special Compensation Fund filed its opposition with LIRAB to Appellant's motion to stay the LIRAB proceedings. The Special Compensation Fund advanced similar arguments as did Ritz–Carlton and Marriott in their opposition.

On February 20, 2004, the LIRAB denied Appellant's motion to stay the LIRAB proceedings.

On March 12, 2004, Appellant filed his "Motion to Dismiss Complaint and/or for Summary Judgment, to Dismiss Criminal Charges, Compel Specificity and Particulars, and to Bar Independent Medical Examination Report of [Dr. Toeller]" with the LIRAB. Appellant argued, *inter alia,* that Ritz–Carlton and Marriott had failed to show that Appellant had committed fraud insofar as he did not receive any benefits after March 30, 2001,[9] Appellant was not treated by Dr. Egami after December 30, 2001, except for a follow-up visit in June of 2002, Appellant would not be able to cross-examine Dr. Toeller, who had passed away, and Appellant's statements before the Department were "self-advocacy" and constitutionally protected conduct.

On March 31, 2004, Ritz–Carlton and Marriott filed their opposition to Appellant's March 12, 2004 motion with the LIRAB. They argued, *inter alia,* that the Department never considered or imposed any criminal charges against Appellant, the fact that Appellant did not receive any PPD benefits is immaterial because HRS § 386–98 is violated when a person acts "so as to obtain benefits" through misrepresentation, and Appellant could offer rebuttal evidence to Dr. Toeller's report.

On April 1, 2004, the Special Compensation Fund filed its joinder to the opposition filed by Ritz–Carlton and Marriott to Appellant's March 12, 2004 motion with the LIRAB. The Special Compensation Fund did not make any additional arguments.

On April 8, 2004, LIRAB denied Appellant's March 12, 2004 motion.

On May 3, 2004, the parties participated in a settlement conference. A settlement was apparently not reached.

### B.

The LIRAB hearing was conducted on May 11, 2004. At that hearing, counsel for Appellant objected to the admission of Dr. Toeller's reports, asserting that Appellant was unable to cross-examine Dr. Toeller as

---

omitted). Accordingly, we need not address Ritz–Carlton and Marriott's argument (1), the Department's argument (3), and Appellant's reply argument (1) regarding exhaustion of administrative remedies in the court appeal. *See infra.*

9. Again, as stated previously, this statement appears to be incorrect inasmuch as Appellant was awarded TTD benefits for April 10, 2001. *See supra* note 5.

the doctor was then deceased, Dr. Toeller's expertise had not been established, and his report was not expert testimony but was, rather, "a comment on credibility."[10] Counsel for the Special Compensation Fund argued in response that Dr. Toeller was still alive when his reports were introduced into evidence at the September 6, 2001 Department hearing and that she believed he died on December 29, 2001. The Hearing Officer denied Appellant's request to exclude Dr. Toeller's reports inasmuch as Appellant did not move to exclude them either at the September 6, 2001 or September 3, 2002 hearings and they became part of the Department file, the reports were relevant, material, and not repetitious, and Appellant had ample time to develop rebuttal evidence.

Appellant testified that he was born and raised in Tonga and did not graduate from high school. He stated that he came to the United States in 1978, but still spoke Tongan at home, and that English was his second language. Appellant related that on March 29, 2001, he told Dr. Egami that he wished to return to work and, therefore, Dr. Egami released him for work starting March 30, 2001.

During direct examination, Appellant gave a brief description of his involvement in dressing the cow:

[APPELLANT]: I was helping only for—and if they show the video, I'm not really helping them on that. I was starting help on—for—I don't know how to—peel the skin, something like that. And when I feel start get pain on my lower back, and then I was sitting down on owner of the farm truck. He was put down his bed, and I was sitting down there and talk story until they finish make the cow. And then I help them put the bag thing up, put the meat inside. And my nephew put all the bag inside the truck.

[COUNSEL FOR APPELLANT]: The bags of meat, how many pounds you figure they weigh?

[APPELLANT]: About 10, 12 pounds.

Appellant testified that he had trouble speaking with Dr. Toeller and that he did not understand several things Dr. Toeller had said to him. He also stated that he could not understand Dr. Toeller's May 9, 2001 report.

Upon cross-examination, Appellant testified that he stood up during the dressing of the cow to stretch his back:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And to do the—the butchering, you had to bend forward at your waist; is that right?

[APPELLANT]: Yes.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And you were bent over at your waist for kind of long times?

[APPELLANT]: If the guys see in the video, it's not too long; and mostly I just bent down little bit for, like, helping on [sic] skin the cow and I have to stand up. It's like exercise. And what the doctor went explain on that same hearing in Wailuku is the kind of exercise it was.

. . . .

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. So you're saying at the beginning of the video you have to stand up and—and stretch your back or something?

[APPELLANT]: Right.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. And if we watch the video closely, we'll see that, or you say it's not on the video?

[APPELLANT]: I don't know if on the video or not on the video.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: What else did you have to do while you were skinning this cow to protect your back?

[APPELLANT]: That's all.

Appellant further testified that during the approximately one hour it took to butcher the cow, he did only a small amount of work:

[APPELLANT]: . . . And I no even finish up skinning the cow. It's only one side. And then I was feel pain on my lower back, and I was sitting down with

---

10. In his post-hearing brief filed with the LIRAB on June 25, 2004, Appellant also asserted that Dr. Toeller's reports were hearsay. However, he fails to raise this issue on appeal.

owner of the farm. And we was talk story, and they finish working on the cow. Some time I only come down to help little bit is just hold the bag and hold stuff like—

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: So you said you weren't doing most of the work; somebody else was?

[APPELLANT]: Yes. I had my brother-in-law and my nephew that mostly do the work.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. And you're saying that you only helped skin part of the cow, and then you sit down and rest; is that what you're saying?

[APPELLANT]: Yeah. I no even—when I sit down rest, then some time they ask me for help. I come down again, like hold some other thing. But I'm not even finishing the whole cow myself.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. Did you finish skinning the cow, or you saying you not—you didn't even do that?

[APPELLANT]: I went start, but I never finish skinning the cow.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And you're saying, then, after that, you only helped once in a while?

[APPELLANT]: Yeah, once in a while.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And how long did it take to butcher this cow?

[APPELLANT]: I no remember exactly. Maybe an hour.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. And for that one hour, how much of it did you spend cutting and stuff?

[APPELLANT]: For that one hour, only about 15 minutes I was helping them.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: 15 minutes?

[APPELLANT]: Right.

Appellant was questioned regarding his specific activities in dressing the cow:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And did you cut any of the meat and put it in the bags?

[APPELLANT]: No, I never cut any meat. Only I do I was holding the bag.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. So you said you never cut meat and put it into bags? Is that what you say?

[APPELLANT]: I no remember if I cut meat.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: You ever cut, like, a leg off and put it into a bag?

[APPELLANT]: I never lift up a leg.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: You never lift up a leg?

[APPELLANT]: Yes. I was holding a leg when they try to clean up the inside. This is only when the cow was, like, laying on the back, and—

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. And—and when you were bending a little bit, or what we call 90 degree angle?

. . . .

[APPELLANT]: I don't remember what—how hard I was bending.

Appellant explained that he did not lift any bags and only helped to arrange them in a truck:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: And how many bags of meat did you get from that cow?

[APPELLANT]: About 15, 17 bag[s].

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: 15 to 17. And you said—after the bags were full of meat, did you lift any of the bags?

[APPELLANT]: No.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: So you never lifted a bag?

[APPELLANT]: I no even lift a bag. I remember I lift—I had two bag[s] or three bag[s] is the one—I don't know how to explain that one, but from the inside the cow after they clean up and they put in the different bag. So one is the cut or, like,

the—I have a hard time to explain that one, but it's all the one on the meat. I never even lift up that on the meat. I was helping them when I was go up on the truck, just that all the stuff was on top, and I tried to make it go in the right way.

Appellant related that he was aware that a 0% rating meant he would receive no PPD award, but that a 10% rating meant he would receive some money, but that he had not testified that he believed he should get a 10% rating to receive money:

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Did you think zero percent would mean you get zero money and 10 percent would mean you get some money?

[APPELLANT]: If—if there was, I would say yes, I—I—10 percent.

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: Okay. So you're saying that you thought 10 percent would give you some money and zero percent would give you no money?

[APPELLANT]: Yes.

. . . .

[COUNSEL FOR RITZ–CARLTON AND MARRIOTT]: At the hearing on September 6, 2001, you testified you could not squat for more than 5 seconds, you could not bend for more than 10 to 15 seconds, you know, you only went to church, and you couldn't go hunting, that kind of stuff. And we were talking about the 10 percent rating that you thought you should get. Is the reason you testified about all this stuff because you thought you would get some money?

. . . .

[APPELLANT]: . . . . All I want know— the hearing—I no even know what is the 10 percent to get money. I never even testify for get money. I testify what they ask me the question. I was answer the question.

Alatan testified and narrated the March 29, 2001 video while it was being shown. He stated that the video showed Appellant cutting meat from the cow and lifting bags. Upon cross-examination, Alatan testified that there were children helping to carry meat and that he did not know how much the bags being carried weighed. He also stated that the video showed Appellant standing by the car and doing no work and resting while sitting on a truck. The hearing was then concluded.

On October 7, 2004, the LIRAB issued its "Decision and Order." The LIRAB issued the following relevant findings of fact (findings):

4. Immediately after [Appellant's] March 29, 2001 office visit with Dr. Egami, [Ritz–Carlton's] private investigator followed [Appellant] and videotaped him from approximately 11:26 a.m. to 12:12 p.m., helping two to three other men skinning and slaughtering a 300–400 pound carcass of a cow on a grassy area near the side of a road.

During this period of time, [Appellant] was videotaped standing with a knife in his right hand, and repeatedly bending over to skin and slaughter the cow, and to bag the meat in trash bags. When bending, [Appellant] stood with his feet apart in a stance wider than his hips. He would then bend over at the waist with his arms in front of him to either skin or cut the carcass.

[Appellant] alternated between bending over and then straightening up in a standing position throughout this period. Between 11:26 a.m. and 12:12 p.m., [Appellant] bent over and straightened up about 44 times. [Appellant] also walked about or around the animal in between the bending and standing in order to work on another part of the carcass. At times, [Appellant] was bent over for several seconds; at other times, he was bent over for close to 20 seconds. There were a few instances where [Appellant] stayed bent over continuously for nearly one minute.

Between 12:14 p.m. and 12:16 p.m., [Appellant] was videotaped repeatedly standing and bending over in the bed of a pickup truck arranging bags of meat. [A;a]bout 12:16 p.m., [Appellant] got out of the truck and walked over to another truck. At 12:17 p.m., [Appellant] was shown sitting down on a truck bed.

Between 11:26 a.m. and 12:16 p.m., [Appellant] was on his feet practically the entire time, standing, walking, or bending over. *[Appellant] did not grimace or exhibit any signs of discomfort or pain behavior. His movements appeared fluid. [Appellant] did not appear to have any trouble walking or putting weight on his legs.*

### May 9, 2001 Permanent Impairment Evaluation

5. On May 9, 2001, [Appellant] saw Dr. Toeller for a permanent impairment evaluation. [Appellant] knew the purpose of the evaluation and that depending on the extent of his impairment, he would receive some monetary benefits. *[Appellant] knew that if his rating was 0%, he would receive no permanent disability benefits.*

6. After the [IME], Dr. Toeller reviewed the surveillance video. In a report dated May 10, 2001, Dr. Toeller stated that there were marked differences between [Appellant's] presentation in the video and at his office. According to Dr. Toeller, the video confirmed his belief that [Appellant] gave a 'purposely factitious presentation' at the [IME].

### September 6, 2001 [Department] Hearing

7. On September 6, 2001, a hearing was held at the [Department] before hearings officer Rick Kelley. A notice of the hearing was sent to [Appellant], notifying him that a hearing would be held on September 6, 2001, for the purpose of determining PPD, TTD, and disfigurement.

8. At the September 6, 2001 hearing, [Appellant] testified that he and Dr. Egami discussed the need for a PPD rating so that he could get on with his life. [Appellant] further testified that he disagreed with Dr. Toeller's 0% rating and had discussed Dr. Toeller's rating report with Dr. Egami. [Appellant] believed that he should have been rated "10%" for his work injury. [Appellant] testified that he still had pain in the back everyday, that he sometimes took over-the-counter Tylenol for the pain, that he had been restricted in his activities since the work injury, that

outside of work, he did not do anything except go to church, that he could no longer go hunting or clean animals, that he could try to clean animals, but would not have to, since he had family to do it, and that he could only squat for about 5 seconds at a time and bend over from a standing position for no longer than 15 seconds.

9. After the September 6, 2001 hearing, the [Department] issued a decision dated September 28, 2001, that awarded, among other things, TTD and [TPD] benefits for various periods up through April 10, 2001. The [Department] determined that [Appellant] did not sustain any PPD as a result of the November 2, 2000 work injury.

. . . .

11. On September 3, 2002, a hearing was held before the [Department] on [Ritz–Carlton and Marriott's] fraud complaint. At the hearing, [Ritz–Carlton and Marriott] presented the surveillance evidence to show that [Appellant] committed fraud by misrepresenting his physical condition to Dr. Toeller at the May 9, 2001[IME], and to the hearings officer (or [Department]) at the September 6, 2001 hearing on the extent of PPD.

To establish misrepresentations by [Appellant] at the September 6, 2001 hearing, [Ritz–Carlton and Marriott] read into the record portions of the transcript of the hearing without objection from [Appellant]. [Appellant] also did not object to [Ritz–Carlton and Marriott's] reliance on the statements he made at the hearing to support its complaint for fraud.

12. By decision dated October 11, 2002, the [Department] determined that [Appellant] committed fraud, in violation of HRS § 386–98(a)(8), when he misrepresented and/or concealed his actual physical capabilities to Dr. Toeller at the May 9, 2001[IME], and to hearings officer Kelley at the September 6, 2001 hearing, for the purpose of obtaining PPD benefits. Pursuant to HRS § 386–98(e), the [Department] assessed various administrative penalties against [Appellant].

### Fraudulent Insurance Acts

13. The record shows that [Appellant] had discussed the need for a rating with Dr. Egami. [Appellant] knew that the purpose of the [IME] with Dr. Toeller was to receive a rating that may be used to make an award of PPD. [Appellant] also knew that the purpose of the September 6, 2001 hearing was to determine, among other things, PPD, and it was his position that he should have received a rating of 10%.

14. [Appellant] confirmed that between March 29, 2001 and September 6, 2001, his back condition was about the same, and that what he could or could not do on March 29, 2001, was the same for September 6, 2001.

15. Based on our review of the surveillance video that documented [Appellant's] ability to bend repetitively for about 44 times during a forty-five minute period, sometimes up to 20 to 50 seconds at a time, to skin and slaughter a cow, without evidence of discomfort and pain, and based on Dr. Toeller's report that [Appellant] grimaced in pain throughout the entire examination and complained about pain when bending over, and being severely restricted in his activities due to pain, together with the statements he made to hearings officer Kelley, including his statement that bending significantly worsened his back pain and that he could not bend longer than 15 seconds, *we find that [Appellant] misrepresented and/or concealed his true physical capabilities at the May 9, 2001[IME] with Dr. Toeller and at the September 6, 2001 hearing before hearings officer Kelley.*

*[Appellant's] ability to bend repetitively and for more than 15 seconds at a time during at least a half hour period without pain and discomfort contradicted his presentation to Dr. Toeller and his statements at the September 6, 2001 hearing.* The ability to bend and engage in physical activity, as well as the level of pain that is experienced while performing physical activity are material facts to be considered in the evaluation of impairment and disability. *We find that [Appellant's] knowledge* of the purpose for the [IME] with Dr. Toeller and the September 6, 2001 hearing shows that [Appellant] intentionally or knowingly acted to misrepresent and/or conceal a material fact to Dr. Toeller and hearings officer Kelley for the purpose of obtaining PPD benefits.

16. At trial, [Appellant] tried to minimize his participation in the slaughtering of the cow. [Appellant] testified that he only helped skin part of the cow and did not cut any meat, that he only bent down a "little bit" to help, and that he only helped for 15 minutes out of the hour or so it took to skin and slaughter the cow. *[Appellant] contradicted himself on a number of occasions during trial. His testimony regarding his minimal participation in the butchering or dressing of the animal is certainly not supported by the surveillance video.*

### Penalties

17. The [Department] imposed on [Appellant] administrative penalties in the form of a fine of $5,000.00, a suspension of all benefits, and reimbursement of attorney's fees and costs incurred by [Ritz–Carlton and Marriott] to prosecute the fraud complaint. *These penalties are permitted under HRS § 386–98(e) and appear reasonable based on the evidence.*

(Emphases added.)

The LIRAB also issued the following conclusions of law (conclusions):

1. *We conclude that the [Department] correctly determined that [Appellant] committed fraudulent insurance acts under HRS § 386–98(a)(8)* . . . .

In this case, we found that [Appellant] intentionally or knowingly acted to misrepresent and/or conceal a material fact relating to his physical capability so as to obtain PPD benefits. [Appellant] committed these fraudulent insurance acts at the [IME] with Dr. Toeller and at the September 6, 2001 hearing to determine the extent of PPD.

We do not agree with [Appellant] that he cannot be in violation of HRS § 386–98(a), because whatever acts he may have

committed did not result in an award of PPD benefits. *There is no requirement in the statute that a party be successfully defrauded before a violation of HRS § 386–98(a) can be established.*

We also do not agree with [Appellant] that [Ritz–Carlton and Marriott] failed to establish fraud under HRS § 386–98(a)(8) beyond a reasonable doubt or with clear and convincing evidence. Pursuant to HRS § 91–10(5) [ (Supp.2005) ], we believe that the correct standard of proof in a contested case hearing under Chapter 386 is preponderance of the evidence, unless the law provides otherwise. *We conclude that [Ritz–Carlton and Marriott have met their] burden of proof to show by a preponderance of the evidence that [Appellant] violated HRS § 386–98(a)(8).*

It was mentioned in [Appellant's] post-trial memorandum that [Ritz–Carlton and Marriott] did not specifically allege in its fraud complaint that [Appellant] had misrepresented his physical condition to hearings officer Kelley at the September 6, 2001 hearing. *We note that when [Ritz–Carlton and Marriott] attempted to establish fraud before the [Department] based on [Appellant's] statements to hearings officer Kelley on September 6, 2001, [Appellant] did not object and the matter was essentially litigated at the hearing below.* The [Department] issued an October 11, 2002 decision finding fraud based on [Appellant's] statements to Dr. Toeller and to hearings officer Kelley. *On appeal, [Appellant] did not raise as an issue on appeal whether penalties were improperly assessed under HRS § 386–98(f) due to insufficiency of the fraud complaint.* Accordingly, any issue relating to the alleged deficiency of [Ritz–Carlton and Marriott's] fraud complaint is not before us.

2. Based on the foregoing, we conclude that the administrative penalties assessed by the [Department] pursuant to HRS § 386–98(e) for violations of HRS § 386–98(a)(8) were appropriate.

(Emphases added.) The Department's October 11, 2002 "Decision" was, therefore, affirmed by the LIRAB.

On October 15, 2004, Appellant filed his notice of appeal with this court pursuant to HRS § 386–88 (1993) [11] and Hawai'i Rules of Appellate Procedure (HRAP) Rules 3 and 4. This appeal was docketed as S.C. No. 26899 (the administrative appeal). On September 5, 2006, this court consolidated the court appeal and the administrative appeal under S.C. No. 26389.

## VIII.

### A.

In his appeal Appellant requests that this court issue a writ of mandamus to restrain the State of Hawai'i, Ritz–Carlton, Marriott, and the LIRAB from proceeding against him without substantive and procedural protections. In the court appeal, Appellant contends that (1) "[HRS § 386–98] is unconstitutional because it is an improper application of the police power of the state," inasmuch as (a) "[t]he filing of the complaint in the [Department] is the commencement of criminal charges," (b) "[t]he police power of the state may not be constitutionally delegated to a private entity," (c) the "[p]olice power of the state may not criminalize or penalize protected conduct," (d) [HRS § 386–98] is a penal statute," and (e) "[s]ince the acts constituting criminal and administrative penalties are inextricably interwoven, the statute is not severable," and (2) "[t]he statute is unconstitutional on its face and as applied," because (a) "[e]ven if the statute were deemed severable, it would permit penal penalties without adherence to rules of evidence, burden of proof, and other protections," and (b) "[t]he [Department] has unbridled discretion to im-

---

11. HRS § 386–88 (1993), entitled "Judicial Review," provides in relevant part:

The decision or order of the [LIRAB] shall be final and conclusive, except as provided in section 386–89, unless within thirty days after mailing of a certified copy of the decision or order, the [Department] or any other party appeals to the supreme court subject to chapter 602 by filing a written notice of appeal with the [LIRAB].
Effective July 1, 2006, the decision or order may be appealed to the intermediate court of appeals, and not to the supreme court. HRS § 386–88 (Supp.2005).

pose penalties without appropriate guidelines."[12]

## B.

In the administrative appeal, Appellant posits that (1) "[HRS § 386–98] is an unconstitutional application [of] the police power of the state, and is void on its face, and as applied in this case," (2) "[Ritz–Carlton and Marriott have] failed to prove the essential elements of fraud," insofar as (a) "[a]ssuming *arguendo* that [Dr. Toeller's] report was admissible, there was no proof that the representations or acts of [Appellant] were 'false,' " (b) "[t]he LIRAB relied on an impermissibly low standard of proof," (c) "[t]here was no proof that the statements made to Dr. Toeller were made in contemplation of [Dr. Toeller's] reliance on them, and that [Dr. Toeller] did rely on those statements," (d) "[t]he statements of [Appellant] were immaterial, since no benefits were paid after March 29, 2001 (as charged)," and (e) "[t]here was no legal injury, *i.e.,* detrimental reliance by [Ritz–Carlton]," (3) "[Dr. Toeller's] report did not comply with the requirements to the guides to the evaluation of permanent impairment," (4) "[the LIRAB] should have taken judicial notice of The Guide to Permanent Impairment, 5th ed., AMA Press 2001, which provides the analytical framework for the assessment of permanent impairment," and (5) "[Dr. Toeller] rejected, and did not 'rely' on [Appellant's] statements." In conjunction with his points on appeal, Appellant challenges findings 5, 6, 7, 8, 9, 11, 13, 14, 15, and 16. He also objects to conclusions 1 and 2. Appellant also maintains that HAR § 12–10–77 was violated "in that the complaint does not indicate the date, the nature of the violation(s), and related documentation as required[.]" Appellant requests that this court reverse the LIRAB's decision.[13]

12. In response in the court appeal, Ritz–Carlton and Marriott maintained that (1) Appellant failed to exhaust administrative remedies, (2) "[n]o criminal charges were initiated by the [Department]," (3) "[t]his case does not involve common law fraud ... nor criminal fraud," (4) "HRS § 386–98 is constitutional," insofar as (a) it bears a rational relationship to the legitimate state interest of preventing and punishing workers' compensation fraud, (b) "[w]hen appropriate administrative penalties are imposed, HRS § 386–98 is not a constitutionally serious offense," (c) "[s]ince HRS § 386–98 does not specify another evidentiary standard, the preponderance of the evidence standard applies," and (d) "HRS § 386–98 is not unconstitutionally vague."

In response in the court appeal, the Department asserts that (1) "[t]he [court] correctly concluded that [HRS § 386–98] was constitutional," inasmuch as (a) "[t]he plain language of [HRS § 386–98] provides for criminal *or* administrative penalties to be brought in the courts *or* the administrative agency, respectively," (emphases in original), and (b) "[HRS § 386–98], on its face, does not delegate the State's police power to a private party," (2) "[t]he [court] correctly ruled that [HRS § 386–98] did not entitle [Appellant] to protections afforded a criminal defendant when [Appellant] only faced civil administrative penalties," (3) "[t]he [court] correctly ruled that [Appellant] was required to exhaust administrative remedies before challenging the constitutionality of [HRS § 386–98] in the courts," and (4) "[t]he court properly denied [Appellant's] request for injunction or a writ of mandamus as [Appellant] has other means to challenge the alleged wrong."

In reply in the court appeal, Appellant argues that (1) "[t]he [court] has original jurisdiction to determine the constitutional validity of a statute, and administrative exhaustion is not required," (2) "[Ritz–Carlton and Marriott] were required to prove by 'clear and convincing evidence' that fraud was committed under [HRS § 386–98(a)(8)]," and (3) "[i]nitiation of criminal charges by a private party, and concurrence by the [Department] are constitutionally prohibited."

13. In response in the administrative appeal, Ritz–Carlton and Marriott assert that (1) "HRS § 386–98 is constitutional," (2) "[i]n the interpretation of a statute, great deference must be given to the interpretation by the state regulatory authority charged with its administration," (3) "[w]hile self-advocacy is permitted, misrepresentation is not appropriate and the basis for a fraudulent complaint should include not only what is identified in a complaint, but should include all subsequent proceedings," (4) "this case does not involve common law fraud or the independent tort of fraud ... nor criminal fraud," (5) "[t]he fact that Appellant arguably did not receive any monetary benefit from his fraud should be disregarded as HRS § 386–98 requires only that the acts be done 'so as to obtain benefits,' " (6) "[s]ince there is no specific statute or rule pertaining to the applicable standard of proof in workers' compensation fraudulent insurance act cases in Hawai'i, the 'preponderance of the evidence' standard applies," and (7) the "Guides to the Evaluation of Permanent Impairment [were] appropriately used."

In response in the administrative appeal, the Special Compensation Fund maintains that (1) "[Appellant's] points of error regarding chal-

## IX.

■ "Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision." *Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 306–07, 97 P.3d 372, 382–83 (2004) (quoting *Soderlund v. Admin. Dir. of the Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001)) (internal quotation marks and citation omitted).

Appellate review of the LIRAB's decision is governed by HRS § 91–14(g) (1993), which provides that:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91–14(g), [conclusions] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [findings] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Potter v. Hawai'i Newspaper Agency*, 89 Hawai'i 411, 422, 974 P.2d 51, 62 (1999) (internal quotation marks and citations omitted).

■ " '[T]he courts may freely review an agency's conclusions of law.' " *Lanai Co.*, 105 Hawai'i at 307, 97 P.3d at 383 (quoting *Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990)). The LIRAB's conclusions will be reviewed *de novo*, under the right/wrong standard. *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994) (citing *State v. Furutani*, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994)).

■ "An agency's findings are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." *Poe v. Hawai'i Labor Relations Bd.*, 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998) (citing *Alvarez v. Liberty House, Inc.*, 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5)). " 'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.' " *Poe v. Hawai'i Labor Relations Bd.*, 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (quoting *Kilauea Neighborhood Ass'n v. Land Use Comm'n*, 7 Haw. App. 227, 229–30, 751 P.2d 1031, 1034 (1988)).

---

lenges to a number of [findings] were not argued, thus, pursuant to [HRAP] Rule 28(b)(7), the points not argued should be deemed waived," (2) "[LIRAB] correctly determined that [Appellant] committed a fraudulent insurance act under [HRS] § 386–98(a)(8)," insofar as (a) "[HRS § 386–98] sets forth the requirements for a fraudulent insurance act under chapter 386," (b) "[t]he statute does not require the scheme to commit fraud be successful," (c) "[t]he legislative history reflects a legislative concern about fraud and an intent to deal harshly with individuals who attempt to defraud the workers' compensation system," and (d) "[t]he [LIRAB] correctly found that [Appellant] violated HRS § 386–98," (3) "[t]he [LIRAB] correctly applied the preponderance of the evidence burden of proof as pro-

vided in HRS § 91–10(5)," and (4) "[HRS § 386–98] is constitutional on its face and as applied, and [Appellant] has failed to articulate a coherent argument in challenging the statute's constitutionality."

In reply in the administrative appeal, Appellant argues that (1) "[f]ailure to require specification of charges is a violation of due process," (2) "[Appellant's] fundamental right to confront and cross examine a witness against him was a violation of due process," (3) "[HRS § 386–98] must be strictly construed," insofar as (a) "[t]he statute is penal in character since it applies penalties and forfeitures," and (b) "[s]tatutes in derogation of common law must be strictly construed," and (4) "[t]he use of a preponderance of the evidence standard is violative of due process."

"The interpretation of a statute is a question of law which this court reviews *de novo.*" *Kuhnert v. Allison,* 76 Hawai'i 39, 43, 868 P.2d 457, 461 (1994); *see also Franks v. City & County of Honolulu,* 74 Haw. 328, 334, 843 P.2d 668, 671 (1993). "When construing a statute, our foremost obligation 'is to ascertain and give effect to the intention of the legislature,' which 'is to be obtained primarily from the language contained in the statute itself.' " *Franks,* 74 Haw. at 334, 843 P.2d at 671 (citations omitted).

## X.

Initially as to his request for a writ of mandamus from this court, it appears that Appellant did not file a petition for writ of mandamus with the clerk of this court and, therefore, did not satisfy the procedural requirements set forth in HRAP Rule 21.[14] Accordingly, we would not have jurisdiction to issue a writ of mandamus in this case.

As to a writ of mandamus from the court, we observe that Appellant has provided no discernable argument that would support an issuance of this extraordinary writ from the court. This court may "disregard [a] particular contention" if an appellant "makes no discernable argument in support

of that position[.]" *Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (citations omitted). Therefore, we disregard Appellant's contentions as to the court issuing a writ of mandamus.[15]

## XI.

Appellant asserts that HRS § 386-98 is unconstitutional because it is an improper application of the police power of the state.[16] Appellant must overcome the presumption that HRS § 386-98 is constitutional.[17] Except with respect to suspect classifications, "where it is alleged that the legislature has acted unconstitutionally, this court has consistently held ... *that every enactment of the legislature is presumptively constitutional,* and a party challenging the statute has the burden of showing unconstitutionality *beyond a reasonable doubt.* ... *The infraction should be plain, clear, manifest, and unmistakable." Blair v. Cayetano,* 73 Haw. 536, 541–42, 836 P.2d 1066, 1069 (1992) (internal quotation marks, brackets, and citation omitted) (emphases added). In this regard, Appellant asserts that the filing of the complaint initiated criminal charges and HRS § 386-98 improperly delegates the police power of commencing criminal charges to a private entity.[18] Appellant states that

14. As to jurisdiction concerning the writ of mandamus, "[a]ll cases addressed to the jurisdiction of the supreme court ... shall be filed with the supreme court as shall be provided by the rule of court." HRS § 602–5(8) (1993); *see also* HRAP Rule 17 (stating that "[o]riginal actions including *applications for writs* or other relief, shall conform to the requirements of any applicable statutes and to such orders as may be entered by the appellate court to which the case is assigned" (emphasis added)).

HRAP Rule 21(b) sets forth the procedural requirements for "writs of mandamus directed to a public officer":

*An application for a writ of mandamus directed to a public officer shall be made by filing a petition with the clerk of the supreme court* with proof of service on the officer and the attorney general or the chief legal officer of the court, as applicable. The petition shall conform to the requirements of subsection (a) of this rule. Upon receipt of the prescribed filing fee, the appellate clerk shall docket the petition and submit it to the supreme court for a determination as to whether it will be entertained. If the court elects to entertain the petition, it will be handled in the same manner as a petition under subsection (a) of this rule.

(Emphasis added.) HRAP Rule 21(a) requires that "[t]he petition shall contain: (i) a statement of facts necessary to an understanding of the issues presented; (ii) a statement of issues presented and of the relief sought; and (iii) a statement of reasons for issuing the writ." HRAP Rule 21(a) further directs that "[c]opies of any order or opinions or parts of the record that may be essential to an understanding of the matters set forth in the petition shall be attached to the petition."

15. Accordingly, we need not reach the Department's argument (4) in the court appeal that the court properly denied Appellant's request for an injunction or a writ of mandamus.

16. *See* Appellant's argument (1) in the court appeal, and argument (1) in the administrative appeal.

17. *See* Ritz–Carlton and Marriott's argument (4)(a) in the court appeal.

18. *See* Appellant's arguments (1), (1)(a), (1)(b), and reply argument (3) in the court appeal, and argument (1) in the administrative appeal.

he "does not challenge the statute as having relevance to public health, or welfare, but on the basis that it permits a private party to initiate a *criminal complaint* against a citizen, *as occurred in this case,* without the protections inherent in all criminal prosecutions." (Emphases added.)

However, Appellant was subjected to the administrative penalties set forth in HRS § 386–98(e), and not criminal penalties.[19] Under a plain reading of HRS § 386–98, the criminal penalties set forth in subsection (d) are imposed by a court, and not administratively. HRS § 386–98(d) states that *"[a]ny person subject to a criminal penalty* under this section shall be ordered *by a court* to make restitution to an insurer or any other person for any financial loss sustained by the insurer or other person caused by the fraudulent act." (Emphases added.) Therefore, his argument is inapposite to this case.

 Furthermore, HRS § 386–98(e) states that administrative penalties may be imposed "[i]n lieu of the criminal penalties set forth in subsection (d)." "In lieu of" is defined as "instead of or in place of." *Black's Law Dictionary* 803 (8th ed.2004). Hence, by its plain language, HRS § 386–98 provides for the imposition of either criminal or administrative penalties against a party found to have violated sections (a) or (b), but not both.[20] Appellant, then, is incorrect in his assertion that the criminal and administrative penalties found in HRS § 386–98 are "inextricably woven." [21] On its face, HRS § 386–98 distinguishes criminal from administrative penalties.

Additionally, pursuant to HRS § 386–98(f), it is the administrative proceeding that commences with the filing of a complaint by a private party. By reference to the "director" [22] and the "board," [23] that section [21] refers to the Department and the LIRAB, and not to court proceedings as suggested by Appellant. As the Department maintains, the plain language of HRS § 386–98(d), which governs criminal penalties, does not allude in any way to the commencement of criminal charges as a result of the filing of a complaint by a private party.[25]

Moreover, and as stated previously, Appellant was notified that the Department did not have the power to preside over criminal charges and would not be doing so. On January 25, 2002, the Department informed Appellant that it "lacks jurisdiction in criminal proceedings." Further, at the September 3, 2002 hearing, as maintained *supra,* Appellant sought clarification as to which penalties would be assessed, and was assured that the Department could not, and would not, be assessing any criminal penalties. Accordingly, Appellant's arguments that HRS § 386–98 unconstitutionally delegates the state's police power to private parties by permitting such parties to file a complaint are unpersuasive in this case.

## XII.

 Appellant also asserts that HRS § 386–98 "is unconstitutional on its face and as applied." [26] As to the most substantive of his arguments,[27] Appellant contends that the

---

**19.** *See* Ritz–Carlton and Marriott's argument (2), and the Department's argument (2) in the court appeal. We need not reach Ritz–Carlton and Marriott's argument (2) in the administrative appeal.

**20.** *See* Department's argument (1)(a) in the court appeal.

**21.** *See* Appellant's argument (1)(e) in the court appeal.

**22.** HRS § 386–1 (1993) defines the "director" as "the director of labor and industrial relations."

**23.** HRS § 386–1 defines the "appellate board" as "the labor and industrial relations appeals board."

**24.** *See supra* note 1.

**25.** *See* Department's argument (1)(b) in the court appeal.

**26.** *See* Appellant's argument (2) in the court appeal; *see also* Ritz–Carlton and Marriot's argument (1), and Special Compensation Fund's argument (4) in the administrative appeal.

**27.** Appellant's claim that HRS § 386–98 is unconstitutionally vague is without merit. Appellant was charged with "misrepresenting or concealing a *material fact,*" HRS § 386–98 (emphasis added), and argues that "[a] charge of misrepresenting or concealing a material fact begs the question as to what facts are 'material,' and under what circumstances." This

statute allows for the imposition of criminal penalties, but because it "provides no requirement as to a burden of proof for the imposition of administrative penalties," the "substantial evidence" (default burden of proof) under HRS § 386–85 would likely apply which is a "lesser standard than [the] proof beyond a reasonable doubt [standard] required in criminal prosecutions."[28]

However, as discussed above, the fine that Appellant was ordered to pay was an administrative penalty. *See also infra.* Because Appellant was not assessed a "criminal penalty," HRS § 386–98(d) does not apply to him, and he thus lacks standing to assert this claim. "In the absence of well recognized exceptions, this court has clearly held '[c]onstitutional rights may not be vicariously asserted.' " *Freitas v. Admin. Dir. Of Courts,* 104 Hawaiʻi 483, 486, 92 P.3d 993, 996 (2004) (quoting *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 256, 861 P.2d 1, 9 (1993) (citation omitted)) (footnote omitted) (brackets in original).

◼ Exceptions to the rule against vicarious assertion of constitutional rights include the right to privacy and First Amendment rights. *Id.* at 486 n. 6, 92 P.3d at 996 n. 6 (citing *State v. Kam,* 69 Haw. 483, 488, 748 P.2d 372, 375 (1988) (holding that "sellers of pornographic items ... possess the standing to assert the privacy rights of those persons who wish to buy those items to read or view in the privacy of the home" because buyers of pornography will usually never be subject to prosecution under the statute at issue); *State v. Bloss,* 64 Haw. 148, 151 n. 6, 637 P.2d

1117, 1121 n. 6 (1981) (explaining that overbreadth doctrine is an exception to traditional standing rules because "courts recognized that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted"); *State v. Kaneakua,* 61 Haw. 136, 597 P.2d 590 (1979) (clarifying that overbreadth doctrine is inapplicable to cockfighting because no constitutional right is involved); *and State v. Manzo,* 58 Haw. 440, 445, 573 P.2d 945, 949 (1977) (explaining that overbreadth doctrine as applied to the First Amendment is an exception to "traditional rule that a person may not challenge a statute upon the ground that it might be applied unconstitutionally in circumstances other than those before the court")). Appellant's arguments do not implicate any exception. Furthermore, assuming, *arguendo,* that the proof did not satisfy the "beyond a reasonable doubt" standard required in criminal cases, because Appellant was not assessed a "criminal penalty," the statute is not unconstitutional as applied to Appellant.

◼ Next, Appellant argues that statements he made to an independent medical examiner and before the Department were coerced and their use in his charge constituted a violation of the prohibition against coerced confessions. There is no relevance to this argument because Appellant was not a party to a criminal proceeding.

Appellant states that "the use of the medical report by a deceased doctor was permitted, as against the right to confront and

---

court has stated that "[a] penal statute is vague if a person of ordinary intelligence cannot obtain an adequate description of the prohibited conduct or how to avoid committing illegal acts." *State v. Kam,* 69 Haw. 483, 487, 748 P.2d 372, 375 (1988) (citations omitted). The term "material fact" is defined as "a fact that is significant or essential to the issue or matter at hand." *Black's Law Dictionary* 629 (8th ed.2004). Because this term is easily definable and allows a person of ordinary intelligence to obtain an adequate description of the prohibited conduct, the statute is not unconstitutionally vague. *See also* Ritz–Carlton and Marriott's argument (4)(d) in the court appeal.

Appellant also asserts that HRS § 386–98 is overbroad. "The doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and

precise in its terms, it may sweep so broadly that constitutionally protected conduct is included in its proscriptions." *State v. Bui,* 104 Hawaiʻi 462, 465, 92 P.3d 471, 474 (2004) (internal quotation marks and citations omitted). Appellant makes no argument that constitutionally protected conduct is included within the statute's proscriptions. Thus, this argument is also without merit.

Appellant states that "[w]here a fundamental right is involved, a constitutional standard that a statute must survive is 'strict scrutiny.' " Appellant raises no discernible argument about any fundamental rights that may be implicated in this case.

28. *See* Appellant's argument 2(a) in the court appeal.

cross-examine witnesses," and cites to *State v. Adrian*, 51 Haw. 125, 453 P.2d 221 (1969).[29] Although Appellant does not provide any argument as to why he cites *Adrian*, we note that *Adrian* recognizes a right to confrontation under both the U.S. and Hawai'i Constitutions. 51 Haw. at 130–31, 453 P.2d at 225; *see* U.S. Const. amend. VI (*"In all criminal prosecutions*, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (Emphasis added.)); Haw. Const. Art. I, § 6 (*"In all criminal proceedings*, the accused shall enjoy the right . . . to be confronted with the witnesses against the accused." (Emphasis added.)). The right to confrontation only applies in "criminal prosecutions." U.S. Const. amend. VI; Haw. Const. Art. I, § 6. Because Appellant was not criminally prosecuted, we reject his argument that the use of the medical report violated his right to confrontation.

## XIII.

Appellant states that HRS § 386–98 is a penal statute because "the statute, on its face, makes clear that a [fraudulent insurance] act was sought to be made a criminal act" inasmuch as subsection "(d) designates classifications of criminal conduct, and classifications of penalties."[30] However, as mentioned above, Appellant was assessed administrative penalties under HRS § 386–98(e), and was not subject to criminal penalties under HRS § 386–98(d). Therefore, Appellant's argument pertaining to penalties imposed pursuant to HRS § 386–98(d) is inapposite.

## XIV.

Appellant also states in a heading to his points of error in the opening brief of his administrative appeal that the LIRAB "erred by failing to . . . compel specificity and particulars[.]" Appellant maintains that there was a violation of HAR § 12–10–77 "in that the complaint does not indicate the date, the nature of the violation(s), and related documentation as required[.]" However, Appellant has failed to provide any discernable argument regarding this point in his opening brief.[31] Accordingly, pursuant to HRAP Rule 28(b)(7), as discussed *supra*, we deem his challenge pursuant to HAR § 12–10–77 waived. We note that although Appellant has provided some argument regarding the specificity of charges in his reply brief,[32] he has waived this issue, and it would be unfair for us to address it. *See Taomae v. Lingle*, 110 Hawai'i 327, 333 n. 14, 132 P.3d 1238, 1244 n. 14 (2006) (denying plaintiffs' request for attorneys' fees on the basis that the request was raised for the first time in their reply memorandum (citing *In re Hawaiian Flour Mills, Inc.*, 76 Hawai'i 1, 14 n. 5, 868 P.2d 419, 432 n. 5 (1994) (holding that arguments raised for the first time in the reply briefs on appeal were deemed waived); HRAP Rule 28(d) (2005) (stating that "[t]he reply brief shall be confined to matters presented in the answering brief")))).

## XV.

Appellant next states that "it is clear that [he] received a punitive sanction since the $5,000.00 fine [imposed pursuant to HRS § 386–98(e)] was not related to any benefits or payments received, nor to restitution to [Ritz–Carlton or Marriott]."[33] Appellant, however, failed to contest finding no. 17. To repeat, uncontested finding no. 17 describes the administrative penalties imposed upon Appellant and states that "[t]hese penalties are permitted under HRS § 386–98(e) and appear reasonable based on the evidence." Since Appellant has not challenged finding no. 17, it is binding on him as well as this court. *See Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 227, 140 P.3d 985, 1007

**29.** *See* Appellant's argument (2) in the court appeal, and argument (1) and reply argument (2) in the administrative appeal.

**30.** *See* Appellant's argument 1(d) in the court appeal.

**31.** *See* Special Compensation Fund's argument (1) in the administrative appeal.

**32.** *See* Appellant's reply argument (1) in the administrative appeal.

**33.** *See* Appellant's argument 1(d) in the court appeal.

(2006) (stating that "[g]enerally, a court finding that is not challenged on appeal is binding upon this court" (citations omitted)).[34]

Appellant does, however, contest conclusion no. 2, which states that "[b]ased on the foregoing, we conclude that the administrative penalties assessed by the [Department] pursuant to HRS § 386–98(e) for violations of HRS § 386–98(a)(8) were appropriate." Conclusion no. 2 is based upon and flows logically from finding no. 17. A conclusion that penalties are "appropriate" is rationally supported by a finding which states that the subject penalties "are permitted under HRS § 386–98(e)" and that they "appear reasonable based on the evidence." Inasmuch as conclusion no. 2 is supported by uncontested finding no. 17 and logically follows from it, we believe conclusion no. 2 is right. *See Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) (opining that "[i]f a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid" (internal quotation marks and citations omitted)). Even if Appellant had properly attacked finding no. 17, though, he fails to demonstrate that the penalties imposed upon him were penal in nature.

## XVI.

We note preliminarily, pursuant to HRS § 386–98(e), that "any person who violates subsections (a) and (b) *may be subject to the administrative penalties of restitution* of benefits or payments fraudulently received . . . , *and one or more* " of the administrative penalties enumerated in HRS § 386–98(e)(1)–(6). (Emphases added.) Therefore, it is of no consequence whether, as Appellant contends, Appellant "was subjected to a fine, without imposition of administrative penalty of restitution or benefits made or any proof of 'payments fraudulently received.' "

Furthermore, HRS § 386–98(a) does not require correlation between a fine imposed under subsection (e), and benefits received. HRS § 386–98(a) includes within its definition of a "fraudulent insurance act" "acts or omissions committed . . . *so as to obtain benefits* [.]" [35] (Emphasis added). Regarding the definition of "so as," it is stated that "so" is "often used with a[n] . . . infinitive phrase introduced by ['as'] that shows the logical result or purpose of an action done in a specific manner with the following clause or phrase serving to indicate the desired manner as well as the outcome of the action." *Webster's Third New Int'l Dictionary* 2160 (1961); *see Singleton v. Liquor Comm'n*, 111 Hawai'i 234, 243–44, 140 P.3d 1014, 1023–24 (2006) ("Where a term is not statutorily defined . . . we may rely upon extrinsic aids to determine such intent. Legal and lay dictionaries are extrinsic aids which may be helpful in discerning the meaning of statutory terms." (Internal quotation marks, brackets, and citation omitted.)).

Therefore, in the context of HRS § 386–98(a), for a fraudulent insurance act to occur, the "logical result or purpose" of "acts or omissions" must be "to obtain benefits." [36] HRS § 386–98(a), then, does not require that a party actually obtain benefits to be subject to a penalty. It only requires that obtaining benefits was the "logical result or *purpose,*" *Webster's Third New Int'l Dictionary* at 2160 (emphasis added), of the party's "acts or omissions," HRS § 386–98(a). By its terms, HRS § 386–98(a) would include an attempt to obtain benefits inasmuch as the "outcome" of obtaining benefits was the "purpose" of Appellant's actions.

This court has stated that "[s]tatutory construction . . . does not authorize the interpolation of conditions into a statute—additional terms—not found in the statute considered as a whole." *Hawaii Pub. Employment Relations Bd. v. United Pub. Workers*, 66 Haw. 461, 469–70, 667 P.2d 783, 789 (1983) (inter-

---

**34.** Although denominated as a finding of fact, finding no. 17 appears to involve a mixed question of law and fact.

**35.** *See* Ritz–Carlton and Marriot's argument (5), and the Special Compensation Fund's argument 2(b) in the administrative appeal.

**36.** We need not reach the Special Compensation Fund's argument (2)(c) in the administrative appeal.

nal quotation marks and citation omitted). Because the plain language of HRS § 386–98 does not require receipt of benefits in order for a fraudulent insurance act to occur, we decline to add such a condition to the statute.

■ Furthermore, we are "bound to construe statutes so as to avoid absurd results." *Franks v. Hawaii Planning Mill Found.*, 88 Hawai'i 140, 144, 963 P.2d 349, 353 (1998) (citation omitted). To hold that an individual must have succeeded in receiving benefits would penalize a vigilant employer or insurance carrier that interdicted a scheme to obtain benefits through fraud or deceit. Such a construction would also cause unnecessary cost and delay in the prevention of fraud.

## XVII.

■ Appellant acknowledges that a fraudulent insurance act under HRS § 386–98(a)(8) is not denominated a crime. Courts of this jurisdiction, however, have recognized that "[t]he legislature's declaration that a violation is non-criminal and does not constitute a crime does not compel the conclusion that the penalties for conviction of a violation are civil rather than criminal." *State v. Simeona*, 10 Haw.App. 220, 231, 864 P.2d 1109, 1115 (1993), *overruled on other grounds*, *State v. Ford*, 84 Hawai'i 65, 929 P.2d 78 (1996). "[T]he question whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction." *Id.* at 229, 864 P.2d at 1114 (citing *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1938)); *see also United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980).

The U.S. Supreme Court in *Ward* set forth a two-part inquiry for determining whether a statutorily defined penalty is civil or criminal:

> Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. *See*

*One Lot Emerald Cut Stones*, 409 U.S. at 236–38[, 93 S.Ct. 489]. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. *See Flemming v. Nestor*, 363 U.S. 603, 617–21[, 80 S.Ct. 1367, 4 L.Ed.2d 1435] (1960). In regard to this latter inquiry, we have noted that "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Id.* at 617[, 80 S.Ct. 1367]. *See also One Lot Emerald Cut Stones* [, 409 U.S. at 237, 93 S.Ct. 489]; *Rex Trailer Co. v. United States*, 350 U.S. 148, 154[, 76 S.Ct. 219, 100 L.Ed. 149] (1956).

448 U.S. at 248–49, 100 S.Ct. 2636 (citations omitted).

■ As to the first inquiry, it is clear that the legislature intended to impose an administrative penalty under HRS § 386–98(e). Significantly, the legislature labeled the penalties in HRS § 386–98(e) administrative, "a label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph, [HRS § 386–98(d)]." *Ward*, 448 U.S. at 249, 100 S.Ct. 2636 (stating that "[i]nitially, and importantly, Congress labeled the sanction authorized in [the statute] a 'civil penalty,' a label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph"). Therefore, "we have no doubt that [the legislature] intended to allow imposition of penalties under [HRS § 386–98(e) ] without regard to the procedural protections and restrictions available in criminal prosecutions." *Id.* Appellant fails to cite any authority or provide any argument that would persuade us to conclude otherwise, and contrary to the express intent of the statute.[37]

As to the second inquiry, we "consider whether [the legislature], despite its manifest intention to establish a civil, remedial mechanism, nevertheless provided for sanctions so punitive as to 'transform what was clearly

---

**37.** *See* Ritz–Carlton and Marriott's argument (4)(b) in the court appeal.

intended as a civil remedy into a criminal penalty.' " *Id.* (quoting *Rex Trailer Co.*, 350 U.S. at 154, 76 S.Ct. 219 (brackets omitted)). We have applied the seven considerations enunciated by the U.S. Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), to determine whether, "despite the stated non-punitive intent of the legislature, the statute's effects negate the state's nonpunitive intent." *State v. Guidry*, 105 Hawai'i 222, 235, 96 P.3d 242, 255 (2004). "This list of considerations, while certainly neither exhaustive nor dispositive, has proved helpful in [the] consideration of similar questions, and provides some guidance in the present case." *Ward*, 448 U.S. at 249, 100 S.Ct. 2636 (internal citation omitted); *see also Guidry*, 105 Hawai'i at 235–36, 96 P.3d at 255–56.

The seven factors are as follows: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned[.]" *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. 554. "[T]hese factors must be considered in relation to the statute on its face." *Id.* at 169, 83 S.Ct. 554. "It is important to note that not all factors must be satisfied in determining whether a statute has punitive effects." *Guidry*, 105 Hawai'i at 236, 96 P.3d at 256 (citing *Russell v. Gregoire*, 124 F.3d 1079, 1086 (9th Cir.1997) (explaining that even though "the statute imposes an affirmative restraint and imposes a sanction traditionally regarded as punishment[, this] does not override its non-punitive nature"); *Smith v. Doe*, 538 U.S. 84, 97, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (stating that *Mendoza–Martinez* factors are "neither exhaustive nor dispositive" and are "useful guideposts")).

With respect to the first factor, none of the administrative penalties under HRS 386–

98(e) impose any disability or restraint and, therefore, do not approach "the 'infamous punishment' of imprisonment." *Hudson v. United States*, 522 U.S. 93, 104, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Flemming*, 363 U.S. at 617, 80 S.Ct. 1367) (internal quotation marks omitted).

As to the second factor, as stated above, Appellant challenges that the $5,000.00 fine he was assessed amounts to a punitive sanction. However, money penalties have not historically been regarded as punishment. *Hudson*, 522 U.S. at 104, 118 S.Ct. 488 (stating that "neither money penalties nor debarment has historically been viewed as punishment"). Furthermore, "the payment of fixed or variable sums of money [is a] sanction which ha[s] been recognized as enforcible by civil proceedings since the original revenue law of 1789." *Id.* (quoting *Helvering v. Mitchell*, 303 U.S. 391, 400, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (internal quotation marks omitted) (brackets in original)).

As to the third factor, a fraudulent insurance act under HRS § 386–98(a) requires scienter, namely that an individual act "intentionally or knowingly." Accordingly, this factor implicates an attribute of criminal punishment.

As to the fourth factor, we recognize that the imposition of administrative penalties under HRS § 386–98(e) will "deter others from emulating [Appellant's] conduct, a traditional goal of criminal punishment." *Hudson*, 522 U.S. at 105, 118 S.Ct. 488. However, "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.' " *Id.* (quoting *U.S. v. Ursery*, 518 U.S. 267, 292, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (citation omitted)). The legislative history of HRS § 386–98 indicates that fraud penalties were necessary to "insure the integrity of our workers' compensation system." Conf. Comm. Rep. No. 64, in 1985 Senate Journal, at 898. To hold that the presence of a deterrent purpose renders such administrative penalties "criminal" would severely undermine the purposes of the workers' compensation system. *See Bocalbos v. Kapiolani Med. Ctr. for Women & Children*, 89 Hawai'i 436, 442, 974 P.2d 1026,

1032 (1999) (stating that "[o]ne of the primary purposes of the Hawai'i workers' compensation law is the prompt determination and disposition of claims for compensation" (citing *Iddings v. Mee–Lee*, 82 Hawai'i 1, 8, 919 P.2d 263, 270 (1996))).

As to the fifth factor, criminal penalties may be imposed in lieu of administrative penalties for a fraudulent insurance act under HRS § 386–98. *See* HRS § 386–98(e). However, the U.S. Supreme Court has "noted on a number of occasions that 'Congress may impose both a criminal and a civil sanction in respect to the same act or omission.' " *Ward*, 448 U.S. at 250, 100 S.Ct. 2636 (quoting *Helvering*, 303 U.S. at 399, 58 S.Ct. 630; citing *One Lot Emerald Cut Stones*, 409 U.S. at 235, 93 S.Ct. 489). The Court has "found significant the separation of civil and criminal penalties within the same statute," as in this case. *Id.; see also Helvering*, 303 U.S. at 404, 58 S.Ct. 630; *One Lot Emerald Cut Stones*, 409 U.S. at 236–37, 93 S.Ct. 489. Therefore, this factor cannot be said to weigh in favor of Appellant's argument.

As to the sixth factor, as noted above, "to insure the integrity of the workers' compensation system," the legislature strengthened the prohibition against fraud within the system. Conf. Comm. Rep. No. 64, in 1985 Senate Journal, at 898. Therefore, it is apparent that there is an alternative purpose to which the administrative penalties under HRS § 386–98(e) are rationally connected.

As to the seventh factor, HRS § 386–98(e)(1) limits fines to "not more than $10,000 for each violation" and, accordingly, affords discretion in their imposition. Based on this, it cannot be said that the fines that may be imposed under HRS § 386–98(e)(1) would be excessive especially in light of the legislature's objective of preserving the integrity of the workers' compensation system. *See Flor v. Holguin*, 94 Hawai'i 70, 79, 9 P.3d 382, 391

(2000) (stating that the remedial purpose of the system is to "provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause" (internal quotation marks and citations omitted)).

Six of the seven factors appear to weigh against concluding that the sanction of a fine under HRS § 386–98 is punitive. It cannot be said that Appellant has provided the "clearest proof" that administrative penalties imposed pursuant to HRS § 386–98(e) are criminal and punitive, despite the legislature's expressed intent to the contrary. Therefore, we reject Appellant's contention.[38]

## XVIII.

■ Appellant argues that HRS § 386–98 is unconstitutional inasmuch as the Department has "unbridled discretion to impose penalties without appropriate guidelines."[39] In support of this assertion, Appellant appears to contend that he was denied due process inasmuch as penalties were assessed even though he did not receive any benefits to which he was not entitled. "The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest." *Sandy Beach Def. Fund. v. City Council*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989) (citations omitted). We have already rejected Appellant's assertion that he was required to actually receive benefits in order to fall within the penalty provisions of HRS § 386–98. Further, inasmuch as Appellant took part in hearings before the Department and the LIRAB, and insofar as pertinent to this argument he engaged in court proceedings and filed several motions before the court during

38. Inasmuch as we conclude that HRS § 386–98 is not a penal statute, *see infra*, we need not reach Appellant's sub-arguments that "if the penalties are deemed criminal, the right to a jury trial is deemed triggered"; that a fraudulent insurance act is a constitutionally serious offense requiring a jury trial; and that "due process of law requires that a penal statute state with reasonable clarity the act proscribed and provide fixed standards for judging guilt, or that the statute will be deemed void for vagueness," raised in conjunction with Appellant's argument 1(d) in the court appeal. Furthermore, we need not reach Appellant's reply argument 3(a) in the administrative appeal.

39. *See* Appellant's argument (2)(b) in the court appeal.

**34**

the pendency of this case, we conclude that Appellant was not denied due process of law.

## XIX.

■ Appellant also maintains that the police power of the State of Hawai'i cannot criminalize or penalize conduct protected under the First Amendment to the U.S. Constitution, namely free speech, by statements he made at a hearing conducted by the Department, primarily in response to questions by Ritz–Carlton and Marriott's attorneys. According to Appellant "[i]f alleged 'misrepresentation[s]' based on self-advocacy are permitted, no person can be free to make statements at [Department] hearings under threat of criminal or administrative penalty," and "an employer could easily 'set-up' such charges by questioning a *pro se* claimant, to elicit inculpatory statements."[40] Appellant fails to cite to any case law or statute that would support his contention that the First Amendment provides protection to a party that makes misrepresentations to a court or administrative agency under the mantle of "self-advocacy." Therefore, we conclude that a "misrepresentation" before the Department is not constitutionally protected by the First Amendment.[41]

Appellant also contends that "a person always has the right to testify in his own

defense," and cites to the Fifth Amendment to the U.S. Constitution. The Fifth Amendment states that "[n]o person ... shall be compelled in any *Criminal Case* to be a witness against himself[.]" (Emphasis added.) Because Appellant does not provide any argument, it is unclear how the Fifth Amendment supports Appellant's contention, especially because Appellant has not been charged criminally, and has not alleged that he was deprived of the right to testify. Therefore, we reject Appellant's assertion pertaining to the Fifth Amendment.

## XX.

Appellant next asserts that Ritz–Carlton and Marriott failed to prove the elements of civil fraud[42] under Hawai'i law.[43] As stated by Ritz–Carlton and Marriott and the Special Compensation Fund,[44] however, the instant case does not involve civil fraud as defined by Hawai'i law. Appellant, nevertheless, asserts that the language of HRS § 386–98(a)(8) incorporates the elements of civil fraud. However, as indicated *infra*, HRS § 386–98(a)(8) does not require reliance or detrimental reliance by any party, as Appellant contends, for a violation of its terms to occur.[45]

## XXI.

■ Regarding the issue of the appropriate standard of proof in the administrative

---

40. See Appellant's argument (1)(c) in the court appeal.

41. See Ritz–Carlton and Marriott's argument (3) in the administrative appeal.

42. Appellant cites what appears to be *Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (noting that "[t]his court has long recognized that a party claiming fraud must establish the following elements: (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them" (citations omitted)); *Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 230, 11 P.3d 1, 18 (2000) (stating that "[t]o constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his or her] damage" (citations omitted));

*and Matsuda v. Wada*, 101 F.Supp.2d 1315 (D.Haw.1999) (stating that "[u]nder Hawaii law: [t]he elements of fraud include: (1) false representations made by the defendant; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon them; and (4) plaintiff's detrimental reliance" (citation omitted)).

43. See Appellant's arguments (2), (2)(a), (2)(c), (2)(d), (2)(e), and (5) in the administrative appeal.

44. See Ritz–Carlton and Marriott's argument (4), and the Special Compensation Fund's argument (2)(a) in the administrative appeal. Ritz–Carlton and Marriott also asserted in argument (3) in the court appeal that the instant case does not involve common law or criminal fraud.

45. We decline to address Appellant's reply argument 3(b) in the administrative appeal inasmuch as it was raised for the first time in his reply brief. See *Taomae*, 110 Hawai'i at 333 n. 14, 132 P.3d at 1244 n. 14; *see also supra* Part XIV.

hearing, Appellant asserts that Ritz–Carlton and Marriott were required to prove that he violated HRS § 386–98 by clear and convincing evidence.[46] In response, Ritz–Carlton and Marriott argue that "[s]ince HRS § 386–98 does not specify another evidentiary standard, the preponderance of the evidence standard applies" pursuant to HRS § 91–10(5) (Supp.2005).

HRS § 386–98 is silent as to the standard of proof required. At the administrative hearing, the LIRAB rejected Appellant's contention that the "clear and convincing evidence" or "proof beyond a reasonable doubt" standards applied, and determined that "[p]ursuant to HRS § 91–10(5), .... the correct standard of proof in a contested case hearing under [HRS chapter 386] is preponderance of the evidence, unless the law provides otherwise." Applying the preponderance of the evidence standard, the LIRAB concluded that Ritz–Carlton and Marriott "met its burden of proof to show by a preponderance of the evidence that [Appellant] violated HRS § 386–98(a)(8)." For the reasons stated herein, we conclude that a violation of HRS § 386–98 must be proved by clear and convincing evidence.

## XXII.

HRS § 91–10(5) of the Hawai'i Administrative Procedures Act (HAPA) states that in contested cases, *"[e]xcept as otherwise provided by law,* the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence." (Emphasis added.)

The legislative history of HRS § 91–10 indicates that in 1978, the legislature amended HAPA to provide that in contested case hearings, "the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion." Stand. Comm. Rep. No. 682–78, in 1978 Senate Journal, at 1068.

The legislature further specified that "the degree of quantum of proof shall be a preponderance of the evidence." *Id.* However, the legislature also added that this standard shall be applied only "[e]xcept as otherwise provided by law[.]" *Id.*

Prior to this amendment to HAPA, "in contested case proceedings before the various State regulatory boards, commissions, and agencies, it [was] not clear who ha[d] the burden of proof and what the quantum of proof [was] required to carry the burden." *Id.* HAPA had no provision comparable to the Federal Administrative Procedures Act which specified that "the proponent of a rule or order has the burden of proof." Stand. Comm. Rep. No. 288–78, in 1978 House Journal, at 1517. "As a result, the various bodies ... adopted requirements that [were] not uniform." Stand. Comm. Rep. No. 682–78, in 1978 Senate Journal, at 1068.

The legislature noted that "[d]ue to the absence of such a provision it ha[d] been suggested in licensing cases that the quantum of proof required is clear and convincing evidence, a higher standard than by a preponderance." Stand. Comm. Rep. No. 288–78, in 1978 House Journal, at 1517. Notably, the legislature specified that "[t]he bill would adopt *the common law standard* as established for *other civil actions.*" Stand. Comm. Rep. No. 288–78, in 1978 House Journal, at 1517 (emphases added).

## XXIII.

Under Hawai'i law, "clear and convincing" evidence is "defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases." *Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 15, 780 P.2d 566, 574–75 (1989) (citing *Welton v. Gallagher,* 2 Haw.App. 242, 245–46, 630 P.2d 1077, 1081 (1981); *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 138 (Ind.1988); E. Cleary, *McCormick on Evidence,* § 340, at 959–60 (3d ed.1984)); *see*

46. Appellant addresses the issue of burden of proof in his reply argument (2) in the court appeal, in his argument (2)(b) and in his reply argument (4) in the administrative appeal. It is addressed by Ritz–Carlton and Marriott in argument (4)(c) in the court appeal, and argument (6) in the administrative appeal. This issue is addressed by the Special Compensation Fund in argument (3) in the administrative appeal.

also *Coyle v. Compton,* 85 Hawai'i 197, 940 P.2d 404 (App.1997). This standard requires "that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." *Masaki,* 71 Haw. at 15, 780 P.2d at 574–75 (citations omitted).

The "clear and convincing" standard "has been applied to a wide variety of civil cases where for policy reasons the courts require a higher than ordinary degree of certitude before making factual findings." *Id.* at 15, 780 P.2d at 574 (quoting *Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). This standard "is typically used in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant." *Id.* (quoting *Addington,* 441 U.S. at 424, 99 S.Ct. 1804). In such cases, "the interests at stake . . . are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. *Id.* (quoting *Addington,* 441 U.S. at 424, 99 S.Ct. 1804).

"In keeping with these principles, Hawaii's appellate courts have implemented the clear and convincing standard of proof in a myriad of situations." *Iddings,* 82 Hawai'i at 14, 919 P.2d at 276 (citing *Carr v. Strode,* 79 Hawai'i 475, 904 P.2d 489 (1995) (proof to overcome presumption of paternity); *State v. Miller,* 79 Hawai'i 194, 900 P.2d 770 (1995) (proof to establish that criminal defendant is not a flight risk or danger to the community); *State v. Lopez,* 78 Hawai'i 433, 896 P.2d 889 (1995) (inevitable discovery rule); *Calleon v. Miyagi,* 76 Hawai'i 310, 876 P.2d 1278 (1994) (punitive damages); *Maria v. Freitas,* 73 Haw. 266, 832 P.2d 259 (1992) (constructive trust); *Office of Disciplinary Counsel v. Rapp,* 70 Haw. 539, 777 P.2d 710 (1989) (professional misconduct); *Mehau v. Gannett Pac. Corp.,* 66 Haw. 133, 658 P.2d 312 (1983) (defamation); *Woodruff v. Keale,* 64 Haw. 85, 637 P.2d 760 (1981) (termination of parental rights); *Boteilho v. Boteilho,* 58 Haw. 40, 564 P.2d 144 (1977) (oral contract for sale of real estate); *Cresencia v. Kim,* 10 Haw.App. 461, 878 P.2d 725 (1994) (fraud); *Chan v. Chan,* 7 Haw.App. 122, 748 P.2d 807 (1987) (civil contempt); *Tanuvasa v. City and County of Honolulu,* 2 Haw.App. 102, 626 P.2d 117.5 (1981) (proof that government official acted with malice)).

In *Kekona v. Abastillas,* this court held that the Intermediate Court of Appeals gravely erred when it determined that a fraudulent transfer may be proved by a preponderance of the evidence. No. 24051, 113 Hawai'i 174, 182, 150 P.3d 823, 831, 2006 WL 3020312, at *8 (Haw. Sept.26, 2006). In reaching this holding, this court stated:

> [W]e believe that the higher protections afforded by the "clear and convincing" standard of proof were necessary inasmuch as a finding of liability for a fraudulent transfer produces the *reputational harm* that should not be inflicted absent the "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established[.]" [*Masaki,* 71 Haw. at 15, 780 P.2d at 574–75 (citations omitted)]. *Indeed the element of fraud connotes dishonesty and effectively brands the liable defendant with an imprimatur of quasi-criminality.*

*Id.* at 181, 150 P.3d at 830, at *7 (emphases added).

Likewise, in this case, we conclude that "the higher protections afforded by the 'clear and convincing' standard of proof were necessary inasmuch as a finding of liability for a fraudulent [insurance act] produces the reputational harm that should not be inflicted absent the 'degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established[.]' " *Id.* (quoting *Masaki,* 71 Haw. at 15, 780 P.2d at 574–75 (citations omitted)). Indeed, being held liable for a fraudulent insurance act for intentionally or knowingly acting so as to obtain workers compensation benefits *through fraud or deceit* in violation of HRS § 386–98 "connotes dishonesty and effectively brands the liable defendant with an imprimatur of quasi-criminality." *Id.* We hold, then, that a violation of HRS § 386–98, a fraudulent insurance act, must be proved by clear and convincing evidence. Accordingly, the LIRAB erred in applying the preponderance of

the evidence standard of proof under HRS § 91–10(5).

## XXIV.

■ Ritz–Carlton and Marriott argue that a fraudulent insurance act as defined by HRS § 386–98(a)(8) does not involve common law fraud. With respect to fraud, this court has held that "[t]he evidence must be clear and convincing to support a finding of fraud." *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (citation omitted). It should be noted also that "this court has repeatedly required proof by 'clear and convincing evidence' with respect to other fraud-related claims." *Kekona,* 113 Hawai'i at 182, 150 P.3d 831, 2006 WL 3020312, at *8 (citing *Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 431, 32 P.3d 52, 75 (2001) ("fraud on the court under Rule 60(b) must be established by clear and convincing evidence" (citation omitted)); *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (stating that a party alleging fraudulent misrepresentation must establish its elements by "clear and convincing evidence"); *Kang v. Harrington,* 59 Haw. 652, 656–57, 587 P.2d 285, 289 (1978) ("In dealing with written contracts, the standard of proof with respect to a showing of fraud is extremely high. A written contract will be cancelled because of fraud only in a 'clear case and upon strong and convincing evidence.' " (Citation omitted.))). "This court has long recognized that a party claiming fraud must establish the following elements: (1) false representations were made by defendant, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." *Shoppe,* 94 Hawai'i at 386, 14 P.3d at 1067 (citations omitted); *see also Hawaii's Thousand Friends,* 70 Haw. at 286, 768 P.2d at 1301.

As stated previously, under the plain language of HRS § 386–98(a)(8) entitled "*Fraud violations* and penalties," a fraudulent insurance act includes (1) "acts or omissions committed by any person[,]" (2) "who intentionally or knowingly acts or omits to act[,]" (3) "so as to obtain benefits ... *through fraud or*

*deceit* by" (4) "[m]isrepresenting or concealing a material fact":

> A fraudulent insurance act, under this chapter, shall include *acts or omissions committed by any person who intentionally or knowingly acts or omits to act so as to obtain benefits ... through fraud or deceit* by doing the following:
>
> . . . .
>
> (8) *Misrepresenting or concealing a material fact*[.]

(Emphases added.)

Unlike common law fraud, HRS § 386–98(a)(8) does not on its face require reliance or detrimental reliance by any party for a violation of its terms to occur. Rather, as discussed previously, HRS § 386–98 includes within its definition of a "fraudulent insurance act" "acts or omissions committed ... *so as to obtain benefits* [,]" and does not require that an actual benefit be obtained from any party. (Emphasis added.) Therefore, HRS § 386–98(a)(8) does not demand that either reliance or detrimental reliance by another party be proven.

Nevertheless, this distinction does not dissuade us from concluding that the "clear and convincing" standard must apply in light of the interests at stake and the risk of reputational harm to a defending party. *See Masaki,* 71 Haw. at 15, 780 P.2d at 574 (quoting *Addington,* 441 U.S. at 424, 99 S.Ct. 1804); *see also Kekona,* 113 Hawai'i at 181, 150 P.3d 830, 2006 WL 3020312, at *7. As mentioned above, the title of HRS § 386–98 reads "*Fraud* violations and penalties." (Emphasis added.) We have stated that "[w]here a statute is ambiguous, its title may be referred to as an aid in construing the statute." *Honolulu Star Bulletin, Ltd. v. Burns,* 50 Haw. 603, 606, 446 P.2d 171, 173 (1968) (citing *Strathearn S.S. Co. v. Dillon,* 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607 (1920); *Maguire v. Comm'r of Internal Revenue,* 313 U.S. 1, 61 S.Ct. 789, 85 L.Ed. 1149 (1941)). Furthermore, a "fraudulent insurance act" under HRS § 386–98(a) includes "acts or omissions ... so as to obtain benefits ... through *fraud or deceit*" by doing any of acts enumerated in the statute.

The Hawai'i legislature did not define the terms "fraud" or "deceit" as used in HRS § 386–98 in HRS chapter 386. Therefore, these terms should be given their plain meaning. *See Singleton*, 111 Hawai'i at 244, 140 P.3d at 1024 (stating that because there was "no indication in the statute that the term owner of record should be given a special interpretation other than its common and general meaning . . ., under a plain and unambiguous reading of HRS § 281–59, real estate owned by the government [fell] within the statute"). Where instructions given to a jury did not include the legal definitions of "defraud" or "deceit," this court has presumed that the jury applied the commonly understood meaning of those terms. *Roxas v. Marcos*, 89 Hawai'i 91, 148, 969 P.2d 1209, 1266 (1998) (citing HRS § 1–14 (1993) ("The words of a law are generally to be understood in their most known and usual signification[.]"))

Giving fraud its ordinary meaning, fraud is defined as "an instance or an act of trickery or deceit esp[ecially] when involving misrepresentation[.]" *Webster's Third New Int'l Dictionary* at 904. Additionally, the ordinary meaning of "deceit" is "the act or practice of deceiving (as by falsification, concealment, or cheating)[.]" *Id.* at 584. Clearly, being held liable under HRS § 386–98(a)(8) for acting "so as to obtain benefits" through "fraud or deceit" by "misrepresenting or concealing a material fact" poses the same harm to an individual's reputation as under common law fraud, despite the absence of the reliance element. *See Masaki*, 71 Haw. at 15, 780 P.2d at 574 (quoting *Addington*, 441 U.S. at 424, 99 S.Ct. 1804); *see also Kekona*, 113 Hawai'i at 181, 150 P.3d 830, 2006 WL 3020312, at *7.

Ritz–Carlton and Marriott argue, however, that "[o]ther jurisdictions have determined that the burden of proof for workers' compensation fraud statutes is the preponderance of the evidence based on the failure of the statutes to identify any other specific standard," and cite to *Sjostrand v. North Dakota Workers Compensation Bureau*, 649 N.W.2d 537 (N.D.2002), and *DeNuptiis v. Unocal Corp.*, 63 P.3d 272 (Alaska 2003), to support its contention. Because these cases do not comport with the law and policies of this jurisdiction as to burdens of proof, they are distinguishable.

In *DeNuptiis*, the Supreme Court of Alaska considered "whether the [state] Workers' Compensation Board [ (board) ] erred in applying a clear and convincing standard of proof to an employer's claim for reimbursement of benefits based on fraud" when the state workers' compensation fraud statute was silent on the standard of proof. 63 P.3d at 275. A subsection of the state's Administrative Procedure Act "call[ed] for a default standard of proof by a preponderance of the evidence in cases where another standard of proof is not set by applicable law[.]" *Id.* at 277–78 (citation omitted). The court reasoned that "[b]ased on the board's delegated rulemaking authority, the board could adopt a rule that the standard of proof in reimbursement proceedings should be by clear and convincing evidence[,]" but because the board had not adopted such a rule, the default standard of proof governed. *Id.* at 278. Therefore, the court "conclude[d] that the board's application of the clear and convincing standard . . . was not a reasonable interpretation of governing law." *Id.*

However, the court specified that "[a]ssuming that 'applicable law' might reasonably include a well-established decision law principle as to the applicable standard of proof, . . . *there is no well-established principle in Alaska that civil 'fraud claims are governed by a clear and convincing standard.*" *Id.* at 278 n. 14 (emphasis added). The court stated, *"To the contrary, our common law decisions require only a preponderance of the evidence."* *Id.* at 278 n. 14 (emphasis added) (citations omitted). Conversely, as discussed *supra*, the case law of this jurisdiction clearly requires that fraud claims be proven by clear and convincing evidence. Therefore, *DeNuptiis* is inapposite to this case.

Similarly, in *Sjostrand*, the Supreme Court of North Dakota considered whether the Workers Compensation Bureau (bureau) erred in using a preponderance of the evidence standard under the state's workers compensation fraud statute, rather than a clear and convincing standard, when the state workers compensation fraud statute was silent on the burden of proof. 649

N.W.2d at 547–49. North Dakota law also provided for a default general standard of proof by a preponderance of the evidence. *Id.* at 547–48. The court noted that under North Dakota law, in proving fraud, "the presumption, if any, is in favor of innocence and the burden falls on him [or her] who asserts fraud to establish it by proving every material element constituting such fraud *by a preponderance of the evidence.*" *Id.* at 548 (internal quotation marks and citation omitted) (emphasis in original). Although the court recognized that it could arguably supply an evidentiary burden of proof to the state fraud statute because none was specified, it declined to do so, and affirmed the bureau's application of the preponderance of the evidence standard. *Id.* at 549.

We observe that where there is no fraud statute in the workers' compensation scheme, courts have imposed a burden of clear and convincing proof. In *Namislo v. Akzo,* the Supreme Court of Alabama stated that because "intentional tortious conduct (*i.e.,* intentional fraud) committed beyond the bounds of the employer's proper role is actionable, we deem it appropriate to address the standard of proof to be applied in determining whether a claim is due to be presented to a jury." 671 So.2d 1380, 1388 (Ala. 1995). The court, quoting from a previous decision, stated that:

> In order to ensure against borderline or frivolous claims, we believe … that a plaintiff, in order to go to the jury on a claim, must make a stronger showing than that required by the "substantial evidence rule" as it applies to the establishment of jury issues in regard to tort claims generally. Therefore we hold that in regard to a fraud claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would qualify as *clear and convincing proof of fraud.*

*Id.* at 1388–89 (internal quotation marks and citations omitted) (emphasis added); *see also Hobbs v. Alabama Power Co.,* 775 So.2d 783, 787 (Ala.2000) (holding "that in regard to a fraud claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would qualify as clear and convincing" (internal quotation marks and citations omitted)); *Kilbarger v. Anchor Hocking Glass Co.,* 107 Ohio App.3d 763, 669 N.E.2d 508, 511 (1995) (holding appellant was not barred by collateral estoppel or res judicata because of a jury verdict that appellant was not eligible to participate in workers' compensation because "[a]t the first trial, appellant was required to prove by a preponderance of the evidence that he was injured" and in this case, "it will be appellee's burden of *proving fraud by clear and convincing evidence*" (emphasis added)). Similarly, in light of the case law of this jurisdiction and policy considerations discussed above, we conclude that a fraudulent insurance act under HRS § 386–98 must be proven by clear and convincing evidence.

## XXV.

■ Appellant argues that the statements he made to Dr. Toeller at the IME "are protected by physician-patient privilege" and "are in the nature of protected conduct recognized by law." However, statements made to a physician during an IME are not subject to the physician-patient privilege inasmuch as the purpose of the IME is not to provide medical treatment to the patient but, rather, is conducted in the context of litigation. *See VanSickle v. McHugh,* 171 Mich. App. 622, 430 N.W.2d 799, 801 (1988) (holding that "the physician-patient privilege is inapplicable when the medical examination or consultation is not conducted for the purpose of rendering medical advice or care to the person asserting the privilege"); *Osborn v. Fabatz,* 105 Mich.App. 450, 306 N.W.2d 319, 322 (1981) (stating that "[a] communication between a person and a physician which is for the purpose of a lawsuit, and not for treatment or advice as to treatment, is not protected by the physician-patient privilege" (citation omitted)). Additionally, Appellant does not argue that he asserted a physician-patient privilege regarding statements made during the IME and the record does not reflect that he did. Appellant also fails to provide any discernible argument as to how

statements made to medical personnel "are in the nature of protected conduct recognized by law." Accordingly, Appellant's argument is without merit.

## XXVI.

■ Appellant maintains that Dr. Toeller did not appropriately use the *AMA Guides to the Evaluation of Permanent Impairment* (5th ed.2001) (the Guides) and that the LIRAB should have taken judicial notice of the Guides.[47] In support of this contention, Appellant states that "[s]ince Mizoguchi and [Dr. Egami] disclaimed being misled, [Ritz–Carlton and Marriott] had only [Dr. Toeller's] report to rely on. That report should have been evaluated with a critical eye since it purported to be proof of fraud." Appellant relies on a passage from the Guides which states that "[i]t is not appropriate to question the individual's integrity. If information from the individual is inconsistent with what is known about the medical condition, circumstances, or written records, the physician should report and comment on the inconsistencies." Appellant also maintains that Dr. Toeller conducted "an incomplete physical examination" because he "relied on three tests only to reach his conclusions."

We are not persuaded that Dr. Toeller's reports inappropriately questioned Appellant's integrity or "purported to be proof of fraud." Although Appellant does not specify which of Dr. Toeller's reports he is referring to or which parts thereof he is relying on, we presume he is citing the part in which Dr. Toeller concluded that Appellant had given a "purposely factitious" exam in the May 9, 2001 IME report. Taken in the context of his report, it would appear that Dr. Toeller was commenting on the inconsistencies he observed while examining Appellant. Dr. Toeller noted several inconsistencies between Appellant's subjective complaints and physical reactions throughout his May 9, 2001 report. Then, as noted previously, in light of those inconsistencies, he stated that "[t]he only objective abnormalities on today's examination were findings of a purposely factitious examination." His report of May 10, 2001

confirmed this finding. Taken in the context of the entire IME, we believe that this statement was a permissible "comment on the inconsistencies" that Dr. Toeller observed throughout the IME. Nowhere in his reports does Dr. Toeller directly comment on Appellant's "integrity," nor does he assert that his reports are proof of fraud. As such, Appellant's argument is unpersuasive.

Appellant provides no argument as to why the LIRAB should have taken judicial notice of the Guides, nor does he assert that he requested that they do so. Appellant also provides no discernible argument in support of his position that Dr. Toeller conducted "an incomplete physical examination." Accordingly, we disagree with his arguments.

## XXVII.

In the administrative appeal, Appellant contests finding nos. 5, 6, 7, 8, 9, 11, 13, 14, 15, and 16 in his points of error on appeal. HRAP Rule 28(b)(4) requires that each point of error "shall state (i) the alleged error committed by the ... agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the ... agency." HRAP 28(b)(4)(c) specifies further that "when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error" shall be included. Appellant has properly set forth his points of error.

However, pursuant to HRAP 28(b)(7), the argument in the opening brief must contain "the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on ... Points not argued may be deemed waived." Appellant has failed to provide any argument whatsoever and has not cited any authorities, statutes or parts of the record to support his challenge to the agency's findings of fact and conclusions of law, in violation of HRAP 28(b)(7). Accordingly, we deem Appellant's

47. This discussion relates to Appellant's arguments (3) and (4), and response argument (7) made by Ritz–Carlton and Marriott in the administrative appeal.

challenge to finding nos. 5, 6, 7, 8, 9, 11, 13, 14, 15, and 16 waived.

### XXVIII.

Because we remand for a rehearing based on the burden of clear and convincing evidence, we do not reach the arguments of the parties as to credibility and the weight of the evidence adduced at the administrative hearings.[48]

### XXIX.

Based on the foregoing, we affirm the court's January 27, 2004 judgment. We vacate the LIRAB's October 7, 2004 decision and order, and remand this case to the LIRAB for a rehearing in accordance with this opinion.

MOON, C.J., and LEVINSON, J., concur in the result only.

---

48. *See* Appellant's arguments (2)(a), (2)(c), (2)(e), and (5) in the administrative appeal. *See also* Special Compensation Fund's argument (2)(d) in the administrative appeal.